[Civ. No. 4139. Third Appellate District.—December 29, 1930.]

SAM HUNTER et al., Appellants, v. COUNTY OF SANTA BARBARA, Respondent.

Chickering & Gregory and Griffith & Thornburgh for Appellants.

Clarence C. Ward, District Attorney, and Vincent E. Morgan for Respondent.

MR. JUSTICE Pro Tem. LUTTRELL Delivered the Opinion of the Court.—Plaintiffs and appellants brought this action in the Superior Court of Santa Barbara County to recover the sum of $98,670.95 as damages for breach of contract. A trial was had resulting in a judgment for defendant and respondent. This appeal is from such judgment and is brought here upon the judgment-roll alone.

The facts of the case, as found by the trial court, are as follows: Some time prior to January 5, 1920, a permanent road division known and designated as the. Permanent Road Division of Lompoc had been regularly created covering a portion of Santa Barbara County. On January 5, 1920, a petition was presented to the board of supervisors of said county asking for the improvement of certain specified roads in said road division and on February 2d of that year said board of supervisors, by proper resolution, ordered that an election be called and held in the district for the purpose of submitting to the electors thereof the question of the issuance and sale of bonds in the amount of four hundred thousand dollars for the purpose of raising money to carry on and complete the work of improving the roads so specified and described in said petition. The election, so called, was, after due notice given, held and resulted in favor of the bonds in the amount specified. The bonds so voted were to run from one to twenty-four years and were to bear five and one-half per cent interest. On the day of calling the election the board of supervisors, by proper action, set aside from the general fund of the county, to be used in connection with the money so to be raised by such bond issue, in the making of said road improvements, the sum of one hundred thousand dollars, and also set aside from the road district fund of District 4 of said county the sum of eleven thousand dollars for the same purpose. The published and posted notices calling said bond election specifically stated that the money to be raised by such bond issue was to be used in the improvement of roads within said perma-

nent road division located as follows: ''Beginning at the junction of the county road with the right-of-way of the Southern Pacific Railroad Company at Lompoc Junction; thence running in an easterly direction along what is known as the westerly extension of Ocean avenue and the county road known as Ocean avenue to the west boundary line of the city of Lompoc and Ocean avenue through the city of Lompoc, and on easterly to the Robinson bridge across the Santa Ynez river; also the road running from Robinson bridge northwesterly to what is known as the Four Corners; also the road from the Four Corners running in a general easterly direction through Santa Rita and through Santa Rosa Rancho and through the lands known as the lands of the Danish-American Colony to where said road intersects the easterly line of said Permanent Road Division; also H street in the city of Lompoc from the center line of Walnut avenue to the center line of Cypress avenue.'' Said election notices then stated in detail just how said described roads were to be improved by specifying the materials to be used, thickness and width of pavement, methods of drainage and other details, and referred the voters to the petitions, orders, plans, maps, detail sheets, estimates and specifications on file in the office of the board of supervisors for a more particular description of the work to be done. In the plans and specifications adopted by the board for such road improvement the roads to be improved were divided into sections known respectively as sections 1, 2, 3, 4A1, 4A2 and 4B, said sections altogether comprising all of the roads described in the bond election notices. The said roads specified in the bond election notices, petition and plans and specifications constitute, as found by the court, a single and continuous road or highway from the west to the east end of the district and are not separate, distinct and indivisible roads, and the work of improving and constructing said roads as also found by the court, constituted a single and indivisible scheme or plan of road construction and improvement.

On or about August 1, 1921, the board of supervisors, notwithstanding the fact that the county treasurer of said county, with whom the bonds which have been voted by the district had been placed for sale, had been unable to sell any of same at par plus accrued interest, advertised for sealed bids for the construction and improvement of

the roads described in the bond election notice and in the plans and specifications. In such advertisement the board asked for bids for the furnishing of necessary tools, machinery, labor and material to complete all of said sections and roads described in the bond election notice, and also for alternative bids for the construction and improvement of each of two separate portions of said roads, the said separate portions being specified in the advertisement. The advertisement for bids contained the usual clause notifying prospective bidders that a bond for faithful performance of the contract would be required of the successful bidder and also that each bidder must accompany his bid with a certified check as a guarantee that the bidder, if successful, would enter into the contract and give the required bond. The right to reject any and all bids not deemed advantageous was reserved.

On or about August 22, 1921, which was within the time specified in the advertisement, plaintiffs filed with the clerk of the board of supervisors their three separate bids for the road construction and improvement, as called for in said advertisement, and accompanied each of said bids with the necessary certified check. In one of such bids or proposals, plaintiffs offered to construct and improve, according to the plans and specifications, that certain portion of the said roads described in the advertisement as sections 4B–4A2–4A1–3 and that portion of section 2 between the westerly town limits of Lompoc and the westerly end of section 3 for the sum of four hundred eighty-five thousand three hundred and eighty and 55/100 dollars.

In another bid submitted they offered to do the required work covering sections 4B–4A2–4A1–3–2 for the sum of five hundred twenty-eight thousand two hundred four and 92/100 dollars, and in a third and separate bid they offered to construct and improve the entire road described in the notice and in the plans and specifications for the sum of seven hundred fifteen thousand three hundred twenty-six and 64/100 dollars. On August 22, 1921, the board of supervisors at a regular meeting thereof, proceeded to open plaintiffs' said bids. There were no other bids submitted. Upon opening the bids, the board considered all of them excessive and upon motion duly made and carried, rejected all of them.

A motion was then made and seconded to reconsider the action of the board' in rejecting said bids. A vote was taken upon this motion and resulted in a tie. The board then adjourned until 2.o'clock in the afternoon of the same day and upon reconvening at said hour a motion was again made to reconsider the action of the board in rejecting plaintiffs' bids. This motion was thereupon carried and the board then by a three to two vote decided to accept plaintiffs' bid to construct and improve the particular sections of the highway to be improved, designated as sections 4B–4A2–4A1–3 and that portion of section 2 lying between the westerly city limits of Lompoc and the westerly end of section 3, for said sum of four hundred eighty-five thousand three hundred and eighty and 55/100 dollars, so bid for such work. This particular portion of the highway constituted about two-thirds of the entire project for which the bonds had been voted. Upon such vote being taken by the board accepting such bid the chairman of the board declared the motion to accept such bid carried and declared the contract awarded to plaintiffs on their said bid, upon their entering into a contract and giving bond for the fulfillment thereof, as provided by law. The aforesaid action of the board was duly entered in the minute-book of the board and the district attorney of the county prepared, in proper form, a written contract for execution, covering the said work. This contract was duly signed by plaintiffs and they furnished the required bond, but the contract was never signed by the chairman and clerk of the board, nor by anyone on behalf of the county. Neither was plaintiffs' bond ever approved. No other action was taken by the board upon either of the other two bids submitted by the plaintiffs.

At the time of this action of the board accepting plaintiffs' said bid for the construction and improvement of only a portion of the roads for which bonds had been voted, the total amount provided and set apart for the construction and improvement of all of the roads specified in the bond election notice was the sum of five hundred eleven thousand dollars, being, as heretofore shown, the one hundred eleven thousand dollars appropriated by the board from the county and the road district funds, plus the four hundred thousand dollars voted at the bond election. It is also a fact, as before stated, that when the action of the board accepting

plaintiffs' bid was taken, as aforesaid, none of the bonds which had been voted by the electors of the road division had either been issued, or sold, for the reason that the same were not salable at par plus accrued interest.

It is also true, as found by the trial court, that the amount left of the five hundred eleven thousand dollars, provided for the construction and improvement of the entire road system in the road division specified and described in the bond election notice, after deducting the four hundred eighty-five thousand, three hundred eighty and 55/100 dollars, the amount of plaintiffs' bid for the construction and improvement of the portion of the road specified therein, would be wholly insufficient to construct and improve the balance of said roads, for which said bonds had been voted.

It is a conceded fact in the case, and so found by the court, that before submitting their bids to the board of supervisors for doing said road work plaintiffs entered into an arrangement with the County National Bank of Santa Barbara, which bank was engaged in the banking business in such city, by which arrangement it was agreed between plaintiffs and such bank that plaintiffs would submit their bid or bids to the board of supervisors of said county for the construction and improvement of said roads of said permanent road division, or certain portions thereof, as called for in the advertisement for bids, and that in submitting such bid or bids, they would add to the amount thereof the sum of sixty thousand dollars, which sum was estimated by plaintiffs and said bank to be the difference between the par value and the market value of said bonds, and that, in the event that plaintiffs' bid was accepted by the board and they secured the contract for doing said road work, said bank would purchase all of the said bonds of said permanent road division at the par value thereof, plus accrued interest, and that the sixty thousand dollars, so to be added to plaintiffs' said bid or bids was for the purpose and was to be used to compensate said bank for the loss to be sustained by it in purchasing said bonds at their par value and reselling same at their market value. Under the aforesaid arrangement, as stated, the bank was only to purchase said bonds after and in the event that plaintiffs' bid for said road work should be accepted.

It is also a conceded fact and so found by the trial court, that pursuant to such arrangement between plaintiffs and the bank, plaintiffs did file their said bid in the sum of four hundred eighty-five thousand three hundred eighty and 55/100 dollars, as hereinbefore mentioned, and that in figuring and estimating the said amount of such bid, they did add and make a part thereof, said sum of sixty thousand dollars for the purpose aforementioned.

The trial court found that at least three of the supervisors of the county, at the time of the opening of the bids of plaintiffs and the action thereon, as heretofore related, knew nothing of such aforesaid arrangement between the plaintiffs and the bank, and had no knowledge that the plaintiffs, in submitting their bid had added to the amount thereof, said sum of sixty thousand dollars for the purpose of compensating the bank for loss sustained, as aforesaid. After plaintiffs' said bid was accepted by the board of supervisors, the bank, pursuant to its agreement with plaintiffs, purchased all of the said bonds of such road division, paying therefor four hundred thousand dollars, the par value thereof, plus accrued interest, and afterward sold all of the said bonds for the sum of three hundred forty-six thousand dollars. The court further found that said bank would not have purchased said bonds, but for the aforesaid action of the board of supervisors in accepting plaintiffs' bid for such road construction work and but for its said agreement with plaintiffs to so add the sixty thousand dollars to their bid for said work, and with said sum so added, compensate it for its loss in so purchasing the bonds.

On September 6, 1921, the board of supervisors, at a regular meeting thereof and over the protest of plaintiffs, rescinded its previous action in accepting the said bid of plaintiffs and rejected plaintiffs' said bid. Santa Barbara County never tendered back to said bank nor to plaintiffs any part of said sum so paid by the bank to the county for said bonds, and the court found that plaintiffs have agreed to reimburse the bank for its said loss in the purchase and resale of said bonds and the plaintiffs are indebted to the bank in said amount.

After rejecting plaintiffs' said bid on September 6, 1921, the board of supervisors proceeded to advertise for bids for the construction of said roads as specified in the bond

election notice, as an entirety, and on December 5, 1921, accepted a bid which had been submitted pursuant to such advertisement, by Fairchild, Gilmore and Wilton Company, for the construction of all of said roads so specified and described in the bond election notice, and awarded the contract therefor to said last mentioned company. Thereafter, on December 13, 1921, plaintiffs filed in proper form with the clerk of the board of supervisors their demand for their claimed damages for breach of contract in said sum for which this suit was brought. This demand was, on March 6, 1922, rejected by the board of supervisors and the present action followed. It was found by the trial court that upon plaintiffs' said bid being accepted by the board of supervisors on August 22, 1921, for the construction work therein described, plaintiffs filed the required bond and proceeded to procure certain equipment with which to do said work and have at all times been ready and willing to proceed with said construction work, but that said board of supervisors refused to proceed further in the matter of acceptance of plaintiff's bid and the awarding of the contract to them.

From the facts thus related and found by the trial court, the conclusion was there drawn that the roads described in the notice of bond election constituted one continuous, indivisible highway and the work of constructing and improving said roads so specified and described, constituted one indivisible scheme or plan of highway improvement and that the board of supervisors was not authorized to advertise for bids for the construction and improvement of any part or portion of said roads, or for any work less than the work of constructing and improving said roads in their entirety, and had therefore no legal authority to accept plaintiffs' said bid for the construction and improvement of only a portion of said roads.

The further conclusion was drawn that the said bid of plaintiffs and the action taken thereon by the board did not constitute a contract for the construction and improvement of said roads, or any portion thereof. The trial court further concluded that the agreement entered into between the plaintiffs and the bank, as mentioned in the facts found in the case, was entered into for the purpose of evading the law which requires bonds of a permanent road division

to be sold for not less than their par value and accrued interest, and that plaintiffs' said bid having been filed pursuant to such agreement was illegal and void, and the action of the board with reference to such bid, was illegal and unauthorized. As heretofore stated, the judgment of the trial court in defendant's favor followed.

The appeal having been taken upon the judgment-roll alone, of course, no question is presented as to the sufficiency of the evidence to sustain the judgment.

In seeking a reversal of the judgment appellants rely upon three propositions: First: That a binding and enforceable contract arose between the plaintiffs and the county immediately upon the acceptance of their bid by the board of supervisors, even though the formal written contract, prepared by the district attorney, was never signed on behalf of the board. Secondly: That said alleged contract was not vitiated by the arrangement between the plaintiffs and the bank and the inclusion of the discount on the bonds in the amount of plaintiffs' bid. Thirdly: That said claimed contract is not invalid because of the fact that it was let for the construction of only a portion of the entire road project.

In meeting these contentions, and in support of the judgment, the respondent claims: First: That no binding and enforceable contract was ever entered into by and between the parties so as to give rise to an action for damages in favor of appellants. Secondly: That the board of supervisors of the defendant county lost jurisdiction to make a valid award to appellants by reason of the unrevoked finding that appellants' bids were excessive. Thirdly: That appellants by adding the amount of sixty thousand dollars to the amount of their bid for the work in question, to enable appellants to reimburse the bank (the purchaser of the bonds), for the loss to be sustained by said bank in reselling said bonds for less than the par value thereof, pursuant to an agreement therefor made prior to the filing of said bids and the purchase of said bonds, entered into a fraudulent conspiracy to evade the law with respect to the purchase of bonds for less than the par value plus accrued interest and that such bid so filed was therefore illegal and void. Fourthly: That the appellants' bid, purported to have been accepted by the board of supervisors, was one for only a

portion of the work for which the bonds were voted and therefore illegal and void. Fifthly: That the county of Santa Barbara is not liable in damages for the actions of its board of supervisors when acting for a local improvement district.

It is self-evident that if counsel for respondent are correct in any of these five contentions the judgment in the case must be upheld.

In their briefs counsel on both sides have given much space to a discussion of the question as to whether or not the submission by appellants of their written bid in response to the advertisement of the board of supervisors and its subsequent acceptance by the board and the minute entry thereof in the board's records, constituted a contract between the parties.

In the view we have taken of the case it matters not whether such acts constitute a contract between the parties, or whether, as claimed by respondent, a formal, written document signed and executed by both parties was necessary.

Assuming that such acts of the parties did constitute a contract, we feel that same was illegal and void particularly by reason of the fact that it called for the construction and improvement of only a portion of the road for the construction and improvement of which the bonds had been voted, and left an amount of money in the fund wholly insufficient to construct and improve the balance of the road. The road to be constructed and improved having been specifically described in all of the proceedings leading up to the bond election, and particularly in the notice of the bond election itself, we believe that the taxpayers of the road division voted the bonds for the construction and improvement of that particular road as a whole, and not any particular part or portion thereof, and that when these bonds were so voted a status savoring of a contractual relationship at once arose between the voters on the one hand and the road division represented by the officers charged with the duty of carrying out the improvement for which the bonds were voted on the other, and that the contract, if such it may be called, which thus came into being, could not be altered by one party without the consent of the other. In this case, therefore, when the

board of supervisors sought to do only a portion of the work with the funds which the voters had provided for the doing of the work in its entirety, said board exceeded its authority and violated this contractual relationship which had arisen. Obviously it was the intention of the electors of the road division in having same formed and in later voting the bonds to have the entire highway specifically described in all of the proceedings, constructed and improved in the particular manner specified, and not merely such portion of same as the board of supervisors might see fit to designate. The entire road was wanted by the electors, and nothing else, as they clearly signified in voting the bonds. It may well have been that had the voters known that the board of supervisors had the power, or would have used the bond money to construct and improve only two-thirds of the road involved, leaving the entire project incomplete and possibly ineffective, they would not have voted the bonds. The construction and improvement of only two-thirds of the road for which the bonds were voted might, and no doubt would have, deprived many of the taxpayers of the division of any, or of at least that benefit to which they were entitled as recompense for voting the bonds and paying their portion of the taxes necessary to redeem same. In other words, had the board of supervisors proceeded to construct and improve only the portion of the road specified in the accepted bid of plaintiffs, it might well have meant that only a portion of the division would have been benefited by the improvement, whereas the entire division would have been obligated to pay for same. Indeed, we can readily conceive of how the construction or improvement of only a portion of the road might entirely destroy the possibility of any benefit accruing therefrom to a large portion of the taxpayers of the division. Such action on the part of the officials would create an inequitable division of the benefits without a corresponding equalization of the burdens.

In reaching these conclusions in the premises, we earnestly feel that we are not only carrying out the letter, but the very spirit of the law governing such matters. We also believe that our conclusion is amply supported by the decisions of this state. To our minds a similar situation to the one in the instant case upon this point was involved in the well-considered case of *O'Farrell* v. *County of Sonoma,* 189

Cal. 343 [208 Pac. 117, 119]. In that case the electors of Sonoma County at a general bond election called by the board of supervisors, were called upon to vote on the question of issuing bonds of the county in a large sum of money for the purpose of building highways in the county. One of the highways included in the resolution of the board calling the bond election, and in the notice of the bond election was described as follows:

"Sebastopol to Freestone

"Beginning at a point in the present Sebastopol-Freestone Road 1.1 mile westerly from the limits of the Town of Sebastopol; said point at the end of the present oil road; thence along the present road to its intersection with the present Freestone-Valley-Ford Road.

"Distance 4.0 miles. $85,000.00."

Other highways proposed to be constructed were similarly designated and described. The bond election carried and the bonds were sold. When it came to the construction of this Sebastopol to Freestone highway the highway engineer of the county prepared and submitted to the board plans and specifications and estimates calling for the construction of only a portion of the four miles of highway connecting the two towns. His plans covered 1.93 miles of said highway and his estimate of the cost of construction of such portion was eighty-one thousand five hundred dollars, which would leave an insufficient amount out of the eighty-five thousand dollars voted to complete the said road. The board adopted the engineer's plans and specifications and proceeded to advertise for bids for the construction of said 1.93 miles of said highway. Bids were received and the board was about to let a contract when an injunction was sought to restrain such action. In seeking the injunction the plaintiff contended that under the facts as they existed the board could only ask for bids for the construction of the road from Sebastopol to Freestone as an entity and that if the bids were too high the board could not proceed without further authority from the electors. The defendant contended that the board had a discretionary power to spend the entire eighty-five thousand dollars on any part or portion of the road, as such board might deem meet and proper.

In passing upon the point the Supreme Court said: "We think that 'discretionary powers' are a false issue in this case. When the defendant board was contemplating a bond issue on the sixteenth day of April, 1919, it had the statutory right to make its order just as broad, and just as narrow, and just as specific as it was willing to be bound by, so long as the provisions of the statute were complied with. At that time it could have asked generally for the consent of the electors to issue bonds in the sum of $1,640,000 for constructing roads in Sonoma County, but it did not do so; on the contrary, it specified road by road, name by name, and length by length, of each piece of road that was to be constructed. When, in the order, it specified Sebastopol to Freestone, four miles, designating the point of beginning and the point of ending, any question of discretion as to division or subdivision into sections was, as to these elements, exercised once and for all and as a finality. When thereafter, pursuant to that order, the defendant board published a notice to the electors in exact accord with its order, every elector had the right to assume that the statement contained in the order to the effect that a road would be constructed from Sebastopol to Freestone meant the entire distance between these two points—not one end, or the other end, or any part or portion—but the whole." Continuing further on in the opinion the court used this language: "The electors must have also known that ordinarily a board of supervisors has many discretionary powers; but, nothing to the contrary appearing, the electors had the right to assume that after the election the board of supervisors would call for bids for the construction of *a road four miles in length between Sebastopol and Freestone* as described in its order and *costing not to exceed $85,000.* The order calling the election and the ratification of that order by electors constituted a contract between the state and the individuals whose property was thereby affected. (*Peery v. City of Los Angeles,* 187 Cal. 753 [19 A. L. R. 1044, 203 Pac. 992].) After the contract had been made it could not be altered by one of the parties only, but by all of the parties thereto. When by its order, duly accepted by the vote of the electors, the length of the road had been specifically defined, its terminals specifically located, and the cost of the whole established—these elements became a part of the con-

tract. As to them the board, acting alone, could not redivide the contract. Neither could it directly expend the moneys on only a portion of the road. What it could not do directly it could not do indirectly. Such fact is of the utmost importance to the interested parties. It is the only hold the taxpayers have for specifically enforcing the contract as made by them. The very gist of plaintiff's complaint is that the defendant board has not asked for, and has not obtained, a bid for constructing the whole road. For this reason the plaintiff may complain. If the defendant board has the statutory right to let contracts to build said road in sections, then, as the defendant argues, all of the funds may be spent on one mile in the discretion of the board. But the board may not let the contracts piecemeal. It has waived its right to do so.''

We have thus quoted at length from the Sonoma County case for the reason that the situation in that case seems so analogous to the one before us, the decision there seems controlling in the case here.

The principle involved is also supported in the following cases: *Jenkins* v. *Williams,* 14 Cal. App. 89 [111 Pac. 116]; *McMahon* v. *Board of Supervisors,* 46 Cal. 204; *Peery* v. *City of Los Angeles,* 187 Cal. 753 [19 A. L. R. 1044, 203 Pac. 992]; *McBean* v. *Redick,* 96 Cal. 191 [31 Pac. 7]; *Treanor* v. *Houghton,* 103 Cal. 60 [36 Pac. 1081]; *Kutchin* v. *Engelbret,* 129 Cal 635 [62 Pac. 214].

Counsel for appellants contend that the *O'Farrell* v. *County of Sonoma* case is not in point here, but that the late case of *Williams* v. *City of Stockton,* 195 Cal. 743 [235 Pac. 986], decided by the Supreme Court after judgment was rendered in the instant case, is decisive of the point under consideration. In making this contention they rely upon the similarity of the statutory provisions under which the action was taken by the board of supervisors in the case at bar and by the city council of the city of Stockton in the Williams case and upon the claimed difference in the statutory provisions in our case and the Sonoma County case. Appellants' counsel also assert that the cases of *McBean* v. *Redick, Treanor* v. *Houghton* and *Kutchin* v. *Engelbret, supra,* are not in point here for the reason that in those cases street improvement proceedings were involved and consequently the proceedings were *in invitum,*

requiring a strict pursuance of all proceedings leading up to the levy and collection of the tax, whereas, the proceedings in the case before us are not *in invitum* for the reason that the bonds for the work to be done had already been voted by the taxpayers.

We have examined all of these cases and find ourselves unable to agree with the contentions of counsel for appellants. To our minds the marked distinction between the *Williams* v. *City of Stockton* case and the Sonoma County case and the one under consideration, is that in the letting of the contracts for the construction and equipment of the city hall in Stockton involved in the former case, all taxpayers of such city who had provided the money for such improvement were treated exactly alike. The action of the city council did not result in an inequitable division of benefits and burdens. The taxpayers of the city were not by such action divided into two classes, one receiving the benefits of the improvement, while the other received none. As heretofore pointed out, just the contrary would have resulted in the Sonoma County case had the action of the board in proposing to let a contract for a portion of the work only, been upheld, and will also result in the instant case unless the judgment rendered is upheld upon this point. We can see other marked differences between the *Williams* v. *City of Stockton* case and the one before us, but deem it unnecessary to discuss them.

As to the claim of the appellant in the case at bar that the McBean, Treanor and Kutchin cases above mentioned, are not in point, suffice it to say that we deem them important upon the general proposition of the contractual relationship which arose out of the proceedings taken, which question we have heretofore discussed in this opinion.

We feel that we could safely rest our decision in this case upon this single question of the authority of the board of supervisors to let a contract for one portion of the work only instead of for the work in its entirety, but deem it advisable to give at least a brief consideration to one other important question involved in the appeal; that of whether or not the adding of the sixty thousand dollars to their bid by the plaintiffs for the purpose of saving the bank (the purchaser of the bonds) from loss on account of the difference between the par and the market value of the

bonds vitiated plaintiffs' bid and nullified all of the subsequent proceedings with reference thereto. We believe that it did and that upon this conceded fact alone the judgment in the case might well be affirmed. It would seem that in the interests of public policy, if nothing else, bids for public work should be honest and free from any taint or suspicion of fraud. The taxpayers in this instance who voted the bonds which became, when issued, a lien upon their land, certainly had a right to expect that such bonds would be legally sold at their par value, plus accrued interest, and that every single dollar thus received would be honestly expended in making the improvement for which the bonds were voted. It is self-evident that such would not have been done, had the scheme which was initiated, been accomplished. Certainly sixty thousand dollars of the taxpayers' money would not have gone into road construction and improvement. Under the circumstances may it not well be concluded that plaintiffs' bid for the work was excessive, at least, to the extent of this sixty thousand dollars which the bidders themselves never intended should go into the actual road construction. The law required that these bonds be sold at not less than their par value, plus accrued interest. (Pol. Code, sec. 2765.) Did not the agreement entered into between the bidders and the bank result, and was it not designed to result, in a sale of the bonds at less than par? Did not this agreement result indirectly in accomplishing that which could not be accomplished directly? A similar situation was before the supreme court of Texas in the case of *Wilson* v. *Hebert,* (Tex.) 174 S. W. 861. The law of that state requires that the bonds involved be sold at not less than par and accrued interest. The court said: "If a bidder in view of the fact that the market value of bonds is lower than the par value places his bid at a sum higher than he would have done so as to permit him to pay the difference, the effect is the same as if the bonds had been sold below par. The result is that the taxpayers, who must ultimately pay for the bonds, instead of getting par value for the bonds in work, get in work only the market value, which is less. This method is only the doing indirectly of that which the law positively forbids, and cannot be tolerated."

In the case of *Ogg* v. *Dies,* (Tex. Civ. App.) 176 S. W. 638, the point was disposed of in the following strong lan-

guage: "The statute forbids the sale of bonds for less than par value and accrued interest, and if a contractor bids for both the work and for the bonds and the evidence justifies the conclusion that the bid was fixed at an amount sufficiently in excess of what the work could be done for cash to recompense the contractor for a portion of the amount which he expects to pay for the bonds, such bid should not be accepted, because this method is a clear evasion of the law which forbids the sale of bonds for less than the par value and accrued interest."

These and other authorities which might be cited, seem decisive upon the point. When the plaintiffs and the bank entered into the arrangement under which the bank was not to purchase the bonds unless the plaintiffs secured the contract, and the plaintiffs were to add sixty thousand dollars to the amount of their bid solely for the purpose of insuring the bank against loss in the transaction, thus depriving the taxpayers of the road division of sixty thousand dollars' worth of road construction and improvement, to which they were entitled under the bond issue and the appropriations made by the board of supervisors, surely a fraud upon such taxpayers was in the contemplation of plaintiffs and the bank, which fraud was only prevented by the timely action of the board in rejecting plaintiffs' bid on September 6, 1921. Appellants assert that such arrangement between the plaintiffs and the bank and the carrying out thereof did not vitiate the claimed contract for the reason that the board of supervisors had no knowledge of the inclusion of the sixty thousand dollar item in plaintiffs' bid and that proof of collusion between the plaintiffs and the bank on the one hand and the county authorities on the other is essential to make the transaction illegal. The further assertion is made that the practice indulged in here between the plaintiffs and the bank is a common one among contractors and that a regular, systematized and generally recognized method of financing construction programs will be invalidated if the instant case is decided against appellants on the question of the method used to enable the bonds to be sold. With reference to the last assertion, sufficient it is to say, that if the transaction is illegal, we have no concern with what effect this decision may have upon future contracting or the sale of bonds for public improvements.

With the contention that proof of collusion on the part of the board of supervisors was essential to vitiate the transaction, we find ourselves, under the circumstances of this case, unable to agree for the reasons heretofore discussed. However, upon this point raised by the appellants, the express findings of the court that at least three of the supervisors of the county did not know of the arrangement between plaintiffs and the bank heretofore adverted to, or of the adding by plaintiffs of the sixty thousand dollars to their bid, at the time of the opening of the bid or the board's action thereon, is worthy of note. This finding naturally implies that the other members of the board did have such knowledge, which if true, would according to appellants' own contention, as we understand it, nullify the whole transaction.

Believing that the judgment of the trial court must be sustained for the reasons herein given, we deem it unnecessary to further extend this opinion by a discussion of other questions involved in the appeal.

The judgment is affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 28, 1931, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 19, 1931.