[Civ. No. 1038.   Fourth Appellate District.—November 17, 1932.]

THE CITY OF SAN DIEGO (a Municipal Corporation) et al., Petitioners, v. J. T. MILLAN, as Treasurer, etc., Respondent.

C. L. Byers, City Attorney, and Hunsaker & Cosgrove for Petitioners.

O'Melveny, Tuller & Myers and Paul E. Schwab for Respondent.

Charles C. Crouch as *Amicus Curiae*.

MARKS, J.—This is an original proceeding instituted in this court for the purpose of compelling respondent to invest certain surplus funds, now in the treasury of the City of San Diego, in bonds of that city. Respondent has appeared by a demurrer to the petition, thereby admitting all of its material allegations.

The City of San Diego is a municipal corporation organized and existing under a freeholders' charter. The individual petitioners are the mayor and members of the council of that city. Respondent is its treasurer.

In accordance with the provisions of an act of the legislature of the state of California, approved February 25, 1901 (Stats. 1901, p. 27, and acts amendatory thereof), which we will refer to as the Municipal Bonding Act, the City of San Diego authorized the issuance of bonds in the sum of $4,500,000. We will hereafter refer to them as the El Capitan dam bonds. These bonds were authorized and issued for the acquisition of lands, dam site, reservoir, reservoir site, rights of way, pipe-lines, conduits and a water filtering plant for a dam, and the acquisition, construction and completion of a dam "of the arched, gravity section,

masonry type'', on the San Diego River in San Diego County, and for the acquisition, construction and completion of a pipe-line from the dam to one of the city reservoirs in the City of San Diego ''for the purpose of developing, impounding, conserving, storing and distributing the waters of the San Diego River and its tributaries, for the use of the inhabitants of the City of San Diego''. The bonds were authorized in 1924 and the petition recites that a portion of such bonds of the par value of $1,630,000 have been sold and that bonds of the par value of $2,695,000 remain unsold and in the possession of the city. We assume that an immaterial typographical error has occurred in these allegations of the petition as the total par values of the bonds sold, and the bonds unsold, do not correspond with the total par value of the bonds authorized.

All the proceedings up to the ordinance providing for the issuance of these bonds recited that their principal and interest should be payable in gold coin of the United States. The ordinance issuing the bonds and the bonds themselves provided that the principal and interest should be payable in lawful money of the United States.

The legislature in 1929 (Stats. 1929, p. 1505) passed an act vesting in the state engineer the power to supervise the construction of all dams in the state of California and to determine the type of dam to be built by any political subdivision of the state. In accordance with this act the City of San Diego filed an application for approval of its proposed El Capitan dam. While the proceedings before the state engineer are not set forth in detail, we accept as a fact the statement of counsel for respondent during the oral arguments, that petitioners ''are prevented from constructing the original type of dam by the state engineer'', which was not only not disputed by counsel for petitioners, but affords the foundation for one of their principal arguments in favor of the issuance of the writ. The record justifies the inference that the state engineer withheld authority for the construction of the arched, gravity section, masonry type dam, which dam had not been commenced prior to the taking effect of the act just referred to, and it is clear that he did approve the construction of a hydraulic, earth-filled rock embankment type of dam. The City of San Diego called a special election and obtained the consent of more than two-

thirds of the qualified electors to use the money raised from the sale of the El Capitan bonds for the same purposes as in the original election except that the type of dam to be constructed was described as one ''to be approved by the State Engineer of the State of California, pursuant to the requirements of law''. The El Capitan dam bonds have been validated by three acts of the legislature. (Stats. 1927, p. 6; Stats. 1929, p. 16; Stats. 1931, p. 983.) The last validating act was passed prior to the election authorizing construction of a type of dam to be approved by the state engineer.

The electors of the City of San Diego had at some prior date authorized bonds for the purpose of constructing what is referred to as the Sutherland dam. It appears from the petition that there was the sum of $472,634.22 in the Sutherland dam fund and only $47,990.71 in the El Capitan bond project fund.

On the first day of August, 1932, the City Council of the City of San Diego passed a resolution whereby it determined that there was then in the city treasury to the credit of the Sutherland dam bond fund, surplus moneys in excess of $99,000 not required for the immediate necessities of the city or the purposes for which the Sutherland dam bonds were authorized, and directed respondent, as City Treasurer, to purchase $99,000 of the El Capitan bonds at their par value plus accrued interest with such surplus moneys from the Sutherland dam bond fund. He refused to do this and this proceeding is brought to compel him to make such purchase.

Respondent urges four principal grounds upon which he maintains the writ should be denied. He urges, first, that because in all proceedings leading up to and including the election at which the El Capitan dam bonds were authorized, the bonds and interest were payable in gold coin of the United States, the bonds could only be made payable in such gold coin and not in lawful money of the United States; second, that the money derived from the sale of the bonds could only be used to build a dam of the arched, gravity section, masonry type and not of the hydraulic earth-filled rock embankment type which the city now proposes to build; third, that under the proceedings at which the electors of the City of San Diego purported to authorize the use of the

money raised by the sale of the El Capitan bonds for the construction of the latter type dam, only such moneys in the possession of the city at the time of the election, which amounted to $47,990.71, could be used for the construction of the proposed new type dam and not money to be raised by the future sale of the El Capitan dam bonds; and, fourth, that as the issuance of the Sutherland dam bonds was authorized by the electors of the City of San Diego for a particular purpose, the funds derived from the sale of these bonds could not be used for any other purpose and particularly for the construction of the El Capitan dam.

Under respondent's contention that the bonds could not be made payable in lawful money of the United States, he cites and relies upon the cases of *Skinner* v. *City of Santa Rosa,* 107 Cal. 464 [40 Pac. 742, 29 L. R. A. 512], *Murphy* v. *City of San Luis Obispo,* 119 Cal. 624 [51 Pac. 1085, 39 L. R. A. 444], and *Peery* v. *City of Los Angeles,* 187 Cal. 753 [203 Pac. 992, 19 A. L. R. 1044].

The Skinner and Murphy cases were decided under the provisions of an act of the legislature of March 19, 1889 (Stats. 1889, p. 399, and acts amendatory thereof), the provisions of which varied in material respects from those of the Municipal Bonding Act now in force. The cases are not decisive of the questions we are considering. They recognize the rule that by the issuance and sale of municipal bonds a greater burden cannot be placed upon the taxpayers than the one to which they assented at the bond election. In the Murphy case, Mr. Justice Harrison, the author of the opinion, discussed the relative values of gold coin and lawful money as mediums of exchange and as a matter of argument expressed the view that from "the history and experience of the last forty years" lawful money as distinguished from gold coin was subject to fluctuation and depreciation and did not possess the same stability of value as gold coin. From this it might follow, if the assumption of the learned justice be correct, that bonds payable in lawful money might place a lesser burden upon the taxpayers than if payable in gold coin.

*Peery* v. *City of Los Angeles, supra,* holds that a greater burden cannot be placed upon the taxpayers of a city than that which they authorized in voting in favor of the issuance of bonds bearing interest at the rate of four and one-half

per cent, by selling them at a price less than their par value so as to yield the purchasers a rate of interest in excess of five per cent per annum, under the authority of an act of the legislature approved June 1, 1921 (Stats. 1921, p. 844). The court was of the opinion that a status similar to a contractual relation between the electors and the city was created by the election which would not permit the city to place a burden upon the taxpayers which they had not voluntarily assumed.

In the case of *Town of Martinez* v. *Johnson,* 201 Cal. 397 [257 Pac. 853, 854], the court said: "In the resolution of February 23, 1927, directing the issuance of said bonds it is provided that 'All of said bonds shall bear interest from their date until paid at the rate of five per cent per annum, payable semi-annually.' It will thus be seen that while the ordinance calling said election provided for a six per cent bond, the resolution directing the issuance of the bonds called for a five per cent bond. On account of this variance between the ordinance and the resolution as to the rate of interest the bonds should bear, the town clerk has refused to countersign the bonds prepared in pursuance of and in conformity with the resolution. The sole question involved in this controversy is the power of the board of trustees to direct by resolution the issuance of bonds bearing five per cent interest when the ordinance calling the election to vote upon their issuance provided that they should bear interest at six per cent. . . . It would have been a simple matter, had the legislature desired to limit the power of the governing body of the municipality in this respect, to have inserted such a provision in the statute. It did provide for certain limitations as to the rate of interest the bonds should bear—that is not exceeding six per cent per annum payable semi-annually. It can well be claimed that this studied effort on the part of the legislature to avoid providing that the bonds should bear the same rate of interest as recited in the ordinance and in expressly specifying the maximum rate of interest the bonds might bear, evinces an intention to confer upon the legislative body a discretion in fixing the rate of interest within the limitations provided. This discretion cannot be exercised so as to cast upon the taxpayers of the municipality a burden greater than that provided for in the ordinance

calling the election, but we can see no good reason why it could not be resorted to in an attempt to lessen such burden. The only possible argument that has been presented against such a construction is that the board of trustees or other governing body of the municipality after reciting in the ordinance a definite rate of interest and after the electors of such municipality had voted in favor of the bond issue upon the assumption that the bonds when issued would bear said rate, may thereafter fix a less rate of interest and one so low that would render the bonds unsalable, and thereby defeat the whole scheme of public improvements which had been approved by the electors of the municipality. In answering this argument we would repeat that the legislature could have provided against such an exigency by a simple statement in the statute to that effect, and the fact that it did not include any such provision in the statute may well be taken as indicative of the belief on the part of the legislature that such a contingency would seldom if ever arise. There are advantages in favor of giving such discretion to municipal authorities. A very substantial one is shown by the facts in the present proceeding, that of obtaining the funds for municipal improvements at five per cent instead of six per cent. The legislature may well have considered that the advantages to be gained in investing the municipal authorities with this discretion greatly outweighed any possible disadvantages which might arise in withholding said authority.''

The entire reasoning of the Supreme Court in the extract we have just quoted can be used with equal force in reaching the conclusion that a municipality may make its bonds payable in lawful money notwithstanding the fact that in all proceedings, including the proposition voted on by the electors, payment in gold coin was specified. The Municipal Bonding Act does not require that any medium of exchange in which the bonds will be paid, be specified in any of the ordinances or resolutions leading up to the election, or in the proposition to be voted upon. To paraphrase the foregoing language of the Supreme Court, it can well be claimed that this studied effort on the part of the legislature to avoid providing that the bonds be payable in any specified medium of exchange, evidences an intention to confer upon the legislative body of a municipality a discretion in fixing

any medium of exchange, whether it be lawful money or gold coin, in which the principal and interest of the bonds may be paid. "This discretion cannot be exercised so as to cast upon the taxpayers of the municipality a burden greater than that provided for in the ordinance calling the election, but we can see no good reason why it could not be resorted to in an attempt to lessen such burden." (*Town of Martinez* v. *Johnson, supra.*) Gold coin has been regarded as the nonfluctuating medium of exchange in this country. Past fluctuations of lawful money, as distinguished from gold coin, have been downward. If the fears of Mr. Justice Harrison, as expressed in *Murphy* v. *City of San Luis Obispo, supra,* should prove warranted, it would result in a lessening of the burden placed upon the taxpayers below that placed upon them, were the bonds made payable in gold coin of the United States. There is nothing in the financial history of our country that would support the contention that the change in the medium of exchange would increase such burden. The taxpayers are protected against loss at the time of the initial sale of the bonds by the provision of the Municipal Bonding Act, which prohibits their sale at less than their par value. We conclude that, in making the bonds payable in lawful money of the United States, the legislative body of the City of San Diego did not place a greater burden upon the taxpayers than the one they assumed at the election and that its action was a proper exercise of the discretion with which the legislature has endowed that body.

If we correctly understand the briefs of counsel, there is no serious contention that the curative acts of the legislature, to which we have referred, did not cure "all defects resulting from a failure to comply with the provisions which are merely directory of the mode of the exercise of the power", but that they could not cure "defects and omissions which go to the jurisdiction of the board to act at all, and which make their action absolutely void". (*People* v. *Van Nuys Lighting Dist.*, 173 Cal. 792 [162 Pac. 97, 99, Ann. Cas. 1918D, 255].) It is not contended that these acts cured defects, if any, that occurred in the proceedings leading up to and including the second election, whereby the electors attempted to authorize the use of the money derived from the sale of the El Capitan dam bonds

for the construction of a new type of dam. These proceedings were taken and the election held after the passage of these curative acts.

It is next contended that the attempt to use the money to be derived from the sale of the El Capitan dam bonds for the construction of a dam of the hydraulic earth-filled rock embankment type as approved by the state engineer, instead of one of the arched, gravity section, masonry type, is unauthorized by law and a violation of the contract with the voters, unless the authority so to do be derived solely from the election held under authority of section 9½ of the Municipal Bonding Act. In support of this contention respondent cites the following California authorities: Section 6, Municipal Bonding Act (Stats. 1901, p. 27); *O'Farrell* v. *County of Sonoma,* 189 Cal. 343 [208 Pac. 117], *Jenkins* v. *Williams,* 14 Cal. App. 89 [111 Pac. 116, 118], *Hunter* v. *County of Santa Barbara,* 110 Cal. App. 698 [294 Pac. 1082], and *California Highway Commission* v. *Ballard,* 77 Cal. App. 404 [247 Pac. 527, 529].

The case of *O'Farrell* v. *County of Sonoma, supra,* involved the expenditure of money derived from the sale of bonds issued under the provisions of section 4088 of the Political Code for the purpose of constructing four miles of paved highway. A contract was let for the paving of 1.93 miles of this road, which work would consume practically all of the bond money available for the entire project. This was held illegal, as departing from the purpose for which the bonds were authorized, which was to pave all of the four miles of road and not a minor fraction thereof. The case of *Hunter* v. *County of Santa Barbara, supra,* involved a similar question and a like conclusion was reached. These cases establish the rule that the omission of a substantial portion of the improvement contemplated at the time the bonds were voted is an unauthorized departure from the purpose for which the bonds were issued.

The case of *Jenkins* v. *Williams, supra,* involved the question of the expenditure of money derived from the sale of bonds authorized to construct certain specified bridges in Sacramento County, where the cost of each bridge had been specified by the board of supervisors prior to the election. The cost of the completion of several of the bridges fell short of the amount apportioned for their construction.

The question decided was whether or not any of this surplus could be used to pay for the completion of another bridge, the cost of which exceeded the estimate. The court held it could not. The reasons for this conclusion were found in the language of section 4088 of the Political Code. This section required the board of supervisors, prior to an election, to specify by an order the purpose for which the indebtedness was to be incurred. The section also provided that the money derived from the sale of the bonds should be applied to no other purpose than that specified in the order and that any sum remaining after the completion of the work should be applied toward the payment of the bonds. In reaching its conclusions the court said: "In its order the board declared that it was necessary to incur a bonded indebtedness 'for the purposes hereinafter stated', and that 'said amounts above specified and said purpose so stated are more particularly designated and described as follows'; . . . This order or ordinance was published to give notice to the voters of its purpose and what it was proposed to do with the money derived from the bonds. It does not seem reasonable that the board of supervisors intended or that the voters intended that the power should be reserved to the board to expend the money at their discretion. The more reasonable construction to be given the order and the statute is that the purposes specified in the order should control."

The case of *California Highway Commission* v. *Ballard, supra,* contains language which tends to give some support to the contention of respondent. In July, 1919, the county of Modoc voted bonds for road improvements under the provisions of the County Highway Commission Act. (Stats. 1907, p. 666.) The project included the improvement of the 3.7 miles which was involved in this controversy. In 1925 the legislature passed an act (Stats. 1925, p. 385) authorizing the supervisors to transfer to the state treasury, for the use of the California Highway Commission, moneys derived from the sale of bonds, and to be expended by the California Highway Commission for the improvement of local roads. The board of supervisors attempted to transfer $40,000 from the county highway improvement fund to the state treasury to be used on the 3.7 miles of road. The reasoning of the court on this question is contained in the

following quotation: ''The act then provides that the proceeds of the sale of bonds shall be placed in a special fund to be known as the highway improvement fund of the county and shall be used solely for the purposes set forth in said report, also that no moneys shall be paid out of said funds except upon a warrant of the auditor of said county issued upon the order of the highway commission, duly allowed by the board of supervisors. Following these provisions the act contains a full and complete procedure of carrying on the improvement, giving of notices, letting of contracts, requiring of bonds for the faithful performance of contracts, that the improvements to be made shall be durable and further general provisions not necessary to be further specified herein. . . . The petition filed in this matter sets forth that in accordance with the provisions of subdivision d of section 365h of the Political Code, as amended in 1925, the board of supervisors of Modoc County and the Highway Commission of Modoc County did request the California Highway Commission to accept the said sum of $40,000 and to deposit the same in the state treasury and to use and expend said funds so deposited for the construction of said 3.7 miles of road in Modoc County in accordance with the plans, specifications, and regulations for the construction, realignment, repair and improvement of said road as set forth in said proceeding for the sale of said bonds, etc. This statement in the petition would be sufficient to show that the money is proposed to be used for the same purposes by the California Highway Commission as voted by the electors of Modoc County, were it not for the fact that immediately following this statement the petitioner sets forth the resolutions adopted by the Highway Commission and the board of supervisors of the county of Modoc, which fails to so provide. The resolution of the Highway Commission reads: 'That your Honorable Board request and authorize the California Highway Commission to cause such plans, specifications, estimates, surveys and maps to be prepared as may be necessary for the repair and improvement of said road, and that said Board further request and authorize said California Highway Commission to take full charge of said repairs and improvements, to call for bids, etc., to do all thi..gs which the California Highway Commission may deem necessary for the early and full completion of said repairs and

improvements proposed to said road,' etc. . . . The resolution adopted by the board of supervisors uses the same general language and leaves the question of the kind of improvement to be made wholly and entirely to the California Highway Commission. So far as the resolutions adopted by the County Highway Commission and the board of supervisors of the county of Modoc are concerned, there is nothing which indicates or requires the California Highway Commission to make the kind of improvement upon the road in question which constitutes the basis of the bond issue submitted to the voters of Modoc County.''

Perhaps one of the underlying reasons for this portion of the opinion may be found in the language of section ten of the County Highway Commission Act, *supra*, where it is said: ''All improvements constructed under this act shall be of a durable and lasting character; provided, that said commission shall have the power to determine how said highways shall be improved and constructed, and the character of the materials to be used in the improvement and construction thereof.''

There is nothing in the opinion to indicate that the California highway commission would be required to use of the Modoc County bond money to build ''a durable and lasting'' pavement. It was proposed to take the power to determine ''how said highway(s) shall be improved and constructed, and the character of materials to be used'' from the county authorities and vest it in the highway commission which then would have had authority to ''improve'' the road in any manner it pleased without any obligation to construct an improvement of ''a durable and lasting character.''

Section six of the Municipal Bonding Act provides in part as follows: ''The proceeds of such bonds shall be placed in the municipal treasury to the credit of the proper improvement fund, and shall be applied exclusively to the purposes and objects mentioned in the ordinance.'' It becomes proper for us to consider what were ''the purposes and objects'' to be accomplished by the issuance of the El Capitan dam bonds. It would appear that the real purpose, as stated in the ordinance calling the election, was for ''developing, impounding, conserving, storing and distributing the waters of the San Diego River and its tributaries for

the use of the inhabitants of the City of San Diego''. This general purpose was to be accomplished by means of several improvements which included the acquisition of lands, a dam site, a reservoir and reservoir site, rights of way, pipelines, conduits, a water filtering plant and the construction of a dam of the type originally described. The fact that approximately $1,600,000 had been spent upon parts of the project before the construction of the dam was commenced shows that the several undertakings of the project, other than the dam, were of very considerable importance. It is not suggested that the hydraulic, earth-filled, rock embankment type of dam would be built at a different location than the original dam, or that its cost would be any greater, or that it could not be built and the whole project completed within the amount authorized by the electors, or that it would not be as efficient, suitable, or as safe for impounding the waters of the San Diego River as the arched, gravity section, masonry type of dam first proposed. The question here presented is whether or not the change in the type of dam, which change was made necessary by a law passed by the legislature after the bonds were issued, and by the lawful action of an officer of the state, could be considered such a departure from the purposes for which the bonds had been authorized as to prohibit the use of the bond money for such a type of dam. We have been cited to no California cases which definitely decide this question.

In approaching this question we take as a starting point the principle which has long been recognized by our courts, that the proceedings leading up to the issuance of municipal bonds create a relation between the city and its taxpayers which is in the nature of a contractual relation between parties whether they be public or private.

The California Dam Act (Stats. 1929, p. 1505) has been held to be a valid exercise of a police power by the state under its right to protect the lives and property of its citizens. (*Sawyer* v. *Board of Supervisors*, 108 Cal. App. 446 [291 Pac. 892]; *Department of Public Works* v. *City of San Diego*, 122 Cal. App. 159 [10 Pac. (2d) 102].) In the case of *Bent Bros., Inc.*, v. *Campbell*, 101 Cal. App. 456, at 463 [281 Pac. 717, 719], the court considered the effect upon contractual rights of the exercise of this police power by the state and said: ''In *Union Dry Goods Co.* v. *Georgia*

*Public Service Corp.*, 248 U. S. 372 [39 Sup. Ct. Rep. 117, 118, 63 L. Ed. 309, 9 A. L. R. 1420, see, also, Rose's U. S. Notes Supp.], we find the following in relation to the exercise of the police powers of the state, and also of private rights when they come in conflict. It is there said: 'That private contract rights must yield to the public welfare where the latter is appropriately declared and defined and the two conflict, has been often decided by this court.' (Citing *Manigault* v. *Springs*, 199 U. S. 473 [26 Sup. Ct. Rep. 127, 50 L. Ed. 274, see, also, Rose's U. S. Notes].) And further: 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from' (properly) exercising its police powers 'for the general good of the public, through contracts previously entered into between individuals may thereby be affected'. (Citing a number of authorities.) The opinion in the case from which we are quoting further sets forth the law that 'contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of a legitimate government authority'. (Citing authorities.) Again: 'There is no absolute freedom to do as one wills, or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies an absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. . . . It is settled that neither the "contract" clause nor the "due process" clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.' In the notes appended to the case of *Salt Lake City* v. *Utah Light & Traction Co.*, 52 Utah, 210 [173 Pac. 556], as reported in 3 A. L. R. 715, are quoted so many cases as to prevent any review of them in this opinion, setting forth the extent to which the police

powers of the state may be applied, and the manner in which private rights must yield thereto, establishing abundant authority for the support of the act of the legislature now being considered. Many of the cases referred to in the notes mentioned have to do with the regulation of rates and charges by public service corporations where contracts had been made giving certain consumers or patrons special rates. In practically all of the cases the contracts were held subject to the police powers of the state as exercised through public service corporations. While differing in the circumstances presented, the principle is the same.''

Under the circumstances of 'this case, where in the lawful exercise of its police power the state of California compelled the City of San Diego to change the type of dam which it proposed to build with money secured from the sale of its bonds, the dam not being the sole purpose to be attained by the bond issue, but one of a number of means whereby its general purpose was to be obtained and where the change in the type of dam to be constructed placed no greater burden upon the taxpayers of the City of San Diego than that originally contemplated at the time of the election, no such breach of the contractual relation between the city and the taxpayers occurred as would justify our holding that the type of dam approved by the state officers could not be constructed and paid for with the money derived from the sale of the bonds.

The conclusions we have already reached make it unnecessary for us to consider at length the third ground of defense. We are here concerned only with the disposition of the unsold bonds. If section 9½ of the Municipal Bonding Act in so far as it grants to the governing body and electors of a city the right to change the original purpose for which bonds were issued, does not apply to issued and unsold bonds, then the proceedings taken by the City of San Diego to effect such a change in purpose cannot affect this proceeding. If the contrary is true then the electors of San Diego have authorized the use of the bond money to construct the new type dam.

■ Lastly, respondent maintains that funds derived from the sale of the Sutherland dam bonds cannot be diverted from that fund and used in the construction of the El Capitan ·dam without the express authority from the electors of the City of San Diego. He relies upon the provi-

sions of section six of the Municipal Bonding Act, which we have already quoted, to support this contention. Undoubtedly his position should be sustained if any such diversion of these funds were contemplated. We do not understand that any such action is contemplated.

In 1913 the legislature passed an act (Stats. 1913, p. 76), which provides that: "Any . . . city . . . which . . . hereafter shall have any surplus money in the treasury thereof not required for the immediate necessities of the said . . . city . . . is hereby authorized to invest such portion of any such surplus as to the governing body of said . . . city . . . may be deemed wise or expedient in any bonds . . . hereafter issued by such . . . city." The act further provides that the bonds so purchased may be sold and the proceeds "applied to the purposes for which the money, with which the bonds were originally purchased, was placed in the treasury." This act clearly contemplates a purchase of bonds for a temporary period. The money from the Sutherland dam bonds will not be diverted from the purposes for which the bonds were authorized. When the surplus money is required in the Sutherland dam project the El Capitan dam bonds will be sold and the money returned to the Sutherland dam bond fund. In the meantime this fund will benefit by a higher rate of interest on its money than could be obtained otherwise. This procedure seems to be directly contemplated by the act from which we have quoted.

In addition to joining in all the grounds of objection urged by respondent, *amicus curiae* informs us that there are several actions pending in the Superior Court of San Diego County seeking, among other things, to enjoin the city from proceeding with the construction of the El Capitan dam and the use of the Sutherland dam bond funds for the purchase of the El Capitan dam bonds. He requests us to order copies of the pleadings in these cases brought up to be considered here. He admits that under the circumstances here presented a civil action pending is not a bar to a *mandamus* proceeding and that the converse is true. (*Madary* v. *City of Fresno*, 20 Cal. App. 91 [128 Pac. 340].)

It is ordered that a peremptory writ of mandate be issued as prayed for.

Barnard, P. J., and Jennings, J., concurred.