FRANCIS D. MURPHY, PROSECUTOR, v. TOWN OF WEST NEW YORK, CHARLES SWENSEN, CLERK OF THE TOWN OF WEST NEW YORK, AND ISADORE GLAUBERMAN, DEFENDANTS.

Reargued May 15, 1944—Decided April 6, 1945.

Before Justices PARKER, HEHER and PERSKIE.

For the prosecutor, *Anthony J. Armore.*

For the defendant Isadore Glauberman, *Collins & Corbin* (*Edward A. Markley,* of counsel).

The opinion of the court was delivered by

HEHER, J.   On August 12th, 1942, the Board of Commissioners of the defendant municipality adopted a resolution declaring that an "emergency has arisen with respect to litigation in connection with funds on deposit in the closed

New Jersey Title Guarantee and Trust Company," for which "no adequate provision" had been made in the current budget, and providing for an "emergency appropriation" of $10,000, "pursuant to *R. S.* 40:2–31 (1)." This action was set aside on *certiorari* on the ground that there was, in fact, no emergency within the purview of the statute; and there was also a direction that *certiorari* issue to review a resolution adopted by the local governing body on October 5th, 1942, authorizing the payment of $7,500 to the defendant Glauberman, from the money so appropriated, as "a retainer as special counsel" to the municipality in the matter adverted to, and also a contract made with him for such services. *Murphy* v. *West New York,* 130 *N. J. L.* 341. This latter resolution was also set aside as a corollary of the judgment vacating the appropriation; but there was no ruling as to the validity of the contract. 130 *Id.* 569.

A reargument was had on the prosecutor's motion. He seeks an adjudication that the contract itself is invalid *in toto* as in contravention of *R. S.* 40:2–29 and 40:50–6. Challenging this contention, the defendant Glauberman also urges a re-examination of the question of the validity of the resolution authorizing the payment of the "retainer" of $7,500. It is argued that, since the retainer has been paid to Glauberman, the question is now moot, and that the payment was not, in point of fact, made from money raised under the resolution in question, but from the town's "current account fund," and there was, moreover, an appropriation of $9,700 for "Special Services" in the 1942 budget, and therefore the payment was not made in violation of the statutes invoked. The cases of *State, Hoxsey, Pros.,* v. *Paterson,* 40 *N. J. L.* 186; *Heston* v. *Atlantic City,* 93 *Id.* 317, and *Sleight* v. *Board of Education of Paterson,* 112 *Id.* 422, are cited in support of this position.

But the town's comptroller testified, without contradiction, that there was no "appropriation sufficient to cover the payment" at issue "in the year 1942," except that made by the "emergency resolution" of October 12th. If this was not so, why was it deemed necessary to use the emergency authority conferred by *R. S.* 40:2–31?

*R. S.* 40:2–1, et seq., regulates "county and municipal" budgets. *Section* 40:2–29 ordains that, "Except as may be otherwise provided in *section* 40:2–31 * * *, no officer, board, body or commission shall, during any fiscal year, expend any money (except to pay notes, bonds, or interest thereon), incur any liability, or enter into any contract which by its terms involves the expenditure of money: a. For any purpose for which no appropriation is provided in the budget or by temporary appropriation pursuant to *section* 40:2–12 * * *, or b. In excess of the amount appropriated for any such purpose;" and that "Any contract, oral or written, made in violation hereof shall be null and void as to the county or municipality, and no moneys shall be paid thereon." The making of contracts and the expenditure of money for "capital projects to be financed in whole or in part by the issuance of notes, or bonds," and the making of contracts of lease or for services for a period exceeding the fiscal year in which such contract is made, "when otherwise provided by law," are excluded from this prohibition. Concededly, *section* 40:2–12 has no application. And *section* 40:50–6, as amended by *chapter* 189 *of the laws of* 1941 (*Pamph. L.* 576), directs that "No municipality shall enter into any contract, the cost of which is to be met by funds not included in the budget of appropriations for the year, unless prior thereto there shall have been regularly adopted by the governing body an ordinance authorizing an appropriation sufficient to meet the cost of carrying out the provisions of the contract." This particular section is not applicable to "the use of funds of departments, for the operation of which budget appropriations are not made, nor to contracts for professional services for the liquidation or foreclosure of tax title liens in such municipalities wherein it is agreed that the cost of the services are to be paid, in all or in part, from the funds derived, or to be derived from the redemption of liened property or the sale of foreclosed property, subject to approval of the Department of Local Government."

These are peremptory legislative mandates designed to incorporate sound business principles and practices into the fabric of the local economy, with particular reference to the

avoidance of waste, extravagance and ill-considered spending, and thus to safeguard the interests of those laden with the tax burden and otherwise to serve the common good; and it is axiomatic that they cannot be evaded by any pretense or device whatsoever. *Vide Frank Grad & Son, Inc.,* v. *Newark,* 118 *N. J. L.* 376. Though not an insurance against local maladministration, action by ordinance is a reflective process that also affords an opportunity for the expression of public opinion; and this is manifestly the rationale of the statutory provisions under consideration. *Vide R. S.* 40:49–1, *et seq.*

It does not matter that here the "emergency note," authorized by the resolution passed in the purported exercise of the power granted by *section* 40:2–31, *supra,* was not in fact issued, and that the payment was made from "current funds" on hand. There was no appropriation of the money in compliance with the statutory command. The "Special Services Account" covered other anticipated expenditures; and, moreover, the account was far from sufficient to cover the payment. The local comptroller testified that, while the payment to Glauberman was made from "current funds," the note was held in reserve in the event that it became necessary to replenish the "current account." The latter he termed "the title given to the entire budget." He said that the procedure was "merely a matter of financing."

The case of *Heston* v. *Atlantic City, supra,* is not to the contrary. There, the expenditure was made in the performance of a mandatory duty laid upon the governing body to have an annual audit of the city's books and accounts made by "competent accountants," and to publish the result of the examination; and the city's "contingent fund" was drawn upon for the payment of accountants for services rendered in the performance of the statutory direction. There was a reservation of the question of whether "such a fund may be utilized for every obligation not otherwise provided for." Mr. Justice Minturn said: "It is enough for the purposes of this discussion to determine that since the legislative requirement of publication of the financial status of the city was mandatory and imperative in character, the absence of a specific appropriation could not operate to defeat its execu-

tion, otherwise a well-defined legislative policy presumably devised for the information of the citizen, as a basis for intelligent consideration, in the direction of municipal affairs could be effectually thwarted and subverted by studied inactivity, by a body possessing the peculiar threefold function of appropriating, legislating and disbursing under a legislative conception of concentrated responsibility." He continued: "It is also to be observed that the passage of the resolution required no immediate financial outlay, but that payment was to be 'on the completion of such audit,' which in fact happened after September 1st, 1918, at which time a specific appropriation for the purpose was in existence, and the necessity of resorting to the contingent fund was thereby obviated." He marked the distinction between cases in which "the duty to audit and publish the result was mandatory," and "the local body was simply a legislative instrumentality in its execution," and those in which "the work undertaken by the municipal body * * * was entirely of a discretionary character, and in nowise imperative as a delegated legislative duty."

The case of *Sleight* v. *Board of Education of Paterson, supra,* involved statutes touching the administration of the public school system which have no application here. Nor is the case of *State, Hoxsey, Pros.,* v. *City of Paterson, supra,* in point. There, it was held that, while the governing body was empowered by the city's charter to employ associate counsel to assist the regular law officer of the city when the exigencies of the case so demanded, it could not, under the guise of such employment, entirely supersede the local law officer in "any particular case or class of cases and * * * confide their management to others." Since it was found that there was "no legal objection to the original resolution authorizing the employment of associate counsel," there was no inquiry as to the propriety of the payment of the "retaining fees," for the right to employ counsel ordinarily connotes the right to pay a retaining fee for services lawfully within the retainer, and there was such service in that case. The question of the existence of a covering appropriation, particularly under statutes such as we are now reviewing, was

not in the case. See, in this connection, *Zeller* v. *Guttenberg,* 81 *N. J. L.* 305. But in the case at hand, the local subdivision's freedom of contract is circumscribed by the current statutes.

*Section* 40:2–29, *supra,* renders "null and void" (as to the county or municipality) a contract made in violation of its terms. The contract here is plainly in that category.

Invoking the principle of the case of *Viracola* v. *Long Branch,* 1 *N. J. Mis. R.* 200, it is contended that the contract did not impose "any obligation to be paid in the year 1942;" that the town "would not have been in default and would not have breached the contract had it made no payment" in that year; and that the contract "does not call for the expenditure of any money in the year 1942; it only calls for a promise to pay when convenient." This is obviously not so.

The contract engaged Glauberman "to act as special counsel to associate with the Town Attorney * * * in the prosecution" of a pending suit in chancery to enforce the Town's claim to a preference in the payment of its deposit in the defunct trust company; and the town undertook to pay Glauberman 9% of the money recovered, but not less than $7,500, "if there is a recovery," and to pay him "as soon as conveniently possible after the execution of this agreement, the sum of $7,500 as and for a retainer, * * * which retainer shall be considered payment in full for services rendered if and in the event there is a failure of recovery," and "shall be applied in part payment to any amount which may be due" to Glauberman under the contract, in the event of a recovery. Glauberman undertook "to diligently prosecute said claim to the best of his professional ability, to its final disposition." The contract was made on September 22d, 1942; and the plain meaning of these provisions is that the town would pay the "retainer" within the fiscal year. The parties themselves so construed the stipulation. As stated, the resolution authorizing the payment was adopted on the ensuing October 5th, and the "retainer" was paid the same day. Glauberman was retained because of what the governing body conceived was protracted delay in the prosecution of the suit; and the parties contemplated prompt and dili-

gent action. The term "retainer" is here used in the sense of a fee paid to counsel to insure his future services, as well as compensation for the services thus to be rendered. It was an inducement to Glauberman to undertake the service prescribed by the contract.

And there is manifestly no force to the contention, lastly made, that the invalidation of the contract "would be detrimental to the public interest and would result in a private injustice." *E contra*, it would be a disservice to the public interest were such a disregard of the letter and spirit of the statute to be countenanced. The statute declares the consequences of a violation of the public policy therein laid down; and it must be enforced as written. Private interests yield to the legislative policy.

The contract under review, and the resolution directing the payment of the "retainer" therein provided, are accordingly set aside, with costs.