MILES F. DOLAN, WILLIAM T. DIEFFENBACH, PHILIP CODNER, PAUL LOSICK, FRANK QUITADAMO, WARREN TISCH AND ANNE M. PEMBROKE, PLAINTIFFS-APPELLANTS, v. BOROUGH OF TENAFLY, A MUNICIPAL CORPORATION IN THE COUNTY OF BERGEN AND STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued September 28, 1976—Decided November 30, 1977.

164

Mr. *Walter T. Wittman* argued the cause for appellants *(Messrs. Wittman, Anzalone, Bernstein and Dunn*, attorneys; Mr. *Wittman* and Mr. *Frederick L. Bernstein*, of counsel; Mr. *Thomas W. Dunn* on the brief).

Mr. *Philip R. Carlin* and Mr. *Donald W. De Cordova* argued the cause for respondent (*Messrs. Morrison and Griggs* and *Messrs. Goldberg and Carlin*, attorneys).

*Messrs. Gladstone, Hart, Mandis, Rathe and Shedd* and *Messrs. Moskowitz and Zamparelli* submitted a brief on behalf of *amici curiae* Bergen County Urban League, Suburban Action Institute, Norman Rosen, Eugene Skurnick, Rita Buchsbaum, Berta Lewin, Kermit Berger and Norman Davis.

The opinion of the court was delivered by

MOUNTAIN, J. Plaintiffs are taxpayers of the Borough of Tenafly. They brought this action to test the validity of an ordinance and supplemental resolution which authorized the borough's acquisition of a certain tract of land, to be funded in part by the issuance of bonds. Defendant municipality moved for summary judgment, and the motion was granted. Plaintiffs appealed to the Appellate Division, and we granted certification while the appeal was there pending unheard. 71 *N. J.* 517 (1976). Because of the desirability of an early announcement of our decision in this case, we entered an order of affirmance on October 8, 1976. We now indicate our reasons for this determination. *Cf. Relz v. Mayor & Council of Saddle River,* 69 *N. J.* 563, 565–66 (1976).

In November, 1972, the borough submitted an application to the Commissioner of Environmental Protection seeking a grant under the Green Acres Land Acquisition program to be used in the purchase of approximately 294 acres of open, undeveloped land located in the borough and known

as East Hill. The property in question consisted of three tracts in separate ownership. A ten-acre parcel owned by Mary Ellen Dunham and another parcel of approximately the same size owned by the New Early Christian Church were purchased for about $450,000. Condemnation proceedings were instituted in order to acquire a tract of about 274 acres owned by Centex Homes Corporation. The commissioners returned an initial award of $6,600,000.

Shortly thereafter, in the summer of 1975, the borough adopted Ordinance No. 1088, which appropriated the sum of $7,576,000 to be used for the acquisition of the property described above.[1] The total appropriation included a Green Acres grant of $2,806,000 which the borough had been assured it would receive. It also included $362,000 to be used as a down payment, this sum having been made available from other municipal sources set forth in detail in the ordinance. Finally, it included $4,408,000, the anticipated proceeds of bonds whose issuance was authorized by the ordinance.

Meanwhile Centex had taken an appeal from the award of $6,600,000. At a trial *de novo* the award was increased to $8,500,000, to which was added interest in an amount exceeding $1,100,000. Judgment embodying this determination was entered January 8, 1976.

---

[1] Ordinance No. 1088 stated the purpose of the appropriation to be:

the acquisition, by purchase or condemnation, of lands for passive open space public recreation and park purposes consisting of approximately 294 acres of an area commonly known as the East Hill of the Borough of Tenafly and further consisting of the following tracts or parcels: (1) Lots 3B and 5A in Block 229 and Lots, 1, 2, 3 and 8 in Block 235 formerly owned by Norman E. Blankman, now owned by Centex Homes Corporation; (2) Lot 29 in Block 227 formerly owned by Ellen Ann Dunham; and (3) Lot 30 in Block 227 formerly owned by the New Early Christian Church; all the same being in accordance with the application for said contribution from the State of New Jersey under said Green Acres Local Matching Assistance Program, on file in the office of the Borough Clerk and hereby approved.

It was of course apparent that the appropriation of $7,576,000 was quite insufficient to meet the increased purchase price. Negotiations and discussions ensued; the whole matter received very wide publicity. Finally an agreement was reached. Centex lowered the price to $9,350,000. The Palisades Interstate Park Commission agreed to purchase 14.5 acres of the tract which were contiguous to its park lands for the sum of $500,000. The Nature Conservancy, a well-known conservation organization, undertook to pay $355,000 for 11 acres, it being understood that this sum would be repaid to it as the pledges of private citizens were received. In the meantime this parcel was to be leased by the conservation society to the municipality for a consideration equal to whatever taxes might be assessed against the property. Upon payment from pledges of the whole $355,000, the tract would be conveyed by Nature Conservancy to the borough. This transfer was expected to occur within three years. Lastly, the Jewish Community Center of Englewood agreed to purchase approximately 29 acres for the sum of $1,000,000. All but three acres of this latter tract were to remain as open space. Three acres were to be used as a community center upon which appropriate buildings for recreational purposes were to be erected. An additional grant of $350,000 from the state would cover the increased cost to the borough of the acquisition. The balance of the purchase price, $7,495,000, was to be paid by defendant municipality. Thus, the borough would ultimately obtain title to 250.5 acres instead of 294; the Palisades Interstate Park would acquire 14.5 acres, and the Jewish Community Center would hold 29 acres.

On April 22, 1976 the Mayor and Council of the Borough of Tenafly adopted a resolution approving and adopting the foregoing arrangement. This resolution is the chief object of plaintiffs' attack.

In their brief filed with this Court, as well as at oral argument, plaintiffs have limited their attack upon the municipal action to two main contentions. First, it is argued

that Ordinance No. 1088, which provided for the appropriation and which authorized the bond issue, was susceptible of later amendment and change only by the passage of another ordinance; therefore, the resolution of April 22, 1976 was ineffective. Second, it is urged that the acquisition of this tract has removed the last substantial area of vacant land in the municipality from the reach of development, a result thought to be contrary to this Court's decision in *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,* 67 *N. J.* 151 (1975) (hereafter *"Mount Laurel"*). We will consider these contentions in turn.

██ Plaintiffs' argument with respect to the first point rests very largely upon the proposition of municipal law that, generally speaking, an ordinance cannot be amended or modified by a mere resolution, but only by another ordinance. Recent recognition of this general rule by our Court, with supporting authorities, appears in *Inganamort v. Borough of Fort Lee,* 72 *N. J.* 412, 421 (1977). It must be borne in mind, however, that this familiar rule is entirely subject to the will of the Legislature. If the Legislature so wishes, it may alter the rule in any particular case, as we believe it has done here.

██ The required contents of a bond ordinance are set forth in *N. J. S. A.* 40A:2–12.[2] The relevant portion of this provision reads as follows:

A bond ordinance shall contain in substance the following:

a. an authorization for the issuance of obligations, stating in brief and general terms sufficient for reasonable identification the purpose or purposes for which the obligations are to be issued, a statement of the estimated maximum amount of bonds or notes to be issued, and the estimated cost of such purpose or purposes, but related improvements or properties may be treated as 1 improvement or property * * *.

[*N. J. S. A.* 40A:2–12][3]

---

[2]This section, *N. J. S. A.* 40A:2–12, is now entitled "Contents of bond issue." The context suggests that the title should read, "Contents of bond ordinance."

[3]Other items of information required to be set forth, none of which are in dispute here, include the period of usefulness of the

The Local Bond Law further provides:

All matters not *required* to be contained in the bond ordinance may be determined by subsequent resolutions passed by the recorded affirmative votes of a majority of the full membership of the governing body. [*N. J. S. A.* 40A:2–16; emphasis supplied]

Thus, in a proceeding for the authorization of a bond issue certain *required* items of information must first be set forth "in brief and general terms" in the bond ordinance. *N. J. S. A.* 40A:2–12. No other matters are *required* to be set forth therein. All matters *not required* to appear in the ordinance may thereafter be dealt with by resolution in accordance with *N. J. S. A.* 40A:2–16, *supra.* Further, *N. J. S. A.* 40A:2–17 contains a similar provision concerning procedures for amendment of a bond ordinance during passage. If at the time of second reading an amendment is adopted which *substantially alters* matter *required* to be contained in the ordinance, then final adoption must await further publication and another hearing. Otherwise, the ordinance, as so amended, may be adopted forthwith. This distinction between required delay and immediate passage is precisely the distinction between an ordinance and a resolution.[4] See *N. J. S. A.* 40:49–1. *N. J. S. A.* 40A:2–12, 40A:2–16 and

---

project, confirmation that a supplemental debt statement has been filed, any amount of increase in gross debt that will result, and those expenses that are to be included in cost.

[4]The Local Bond Law contains much internal evidence of a legislative predilection for the use of resolutions in connection with bond issues. In addition to the blanket authorization for the use of this procedure respecting all matters not required to be contained in the bond ordinance itself, *N. J. S. A.* 40A:2–16, other important aspects of bond procedure are permitted to be dealt with in this way. Thus maturities of all bond issues may be determined by resolution. *N. J. S. A.* 40A:2–26. Under specified conditions a private sale of bonds may similarly be undertaken by resolution, *N. J. S. A.* 40A:2–27, and all bond anticipation notes may be marketed in this way, *N. J. S. A.* 40A:2–28. Substantially all details of refunding bonds may be determined by resolution. *N. J. S. A.* 40A:2–58.

40A:2–17 evidence a clear legislative intent to differentiate between substantial alteration of required matter in a bond ordinance and less significant modifications. Therefore, we hold that an amendment to a bond ordinance which does not substantially alter required provisions of the ordinance may be effected by a resolution. Thus, if the April 22, 1976 resolution did not substantially alter required contents of Ordinance No. 1088, the procedure satisfied the Local Bond Law.

Plaintiffs assert that three required provisions in Ordinance No. 1088 were improperly altered: (1) the purpose or purposes for which the obligations were to be issued, (2) the estimated maximum amount of the obligations, and (3) the estimated cost of the project.

█ The resolution of April 22, 1976 clearly left unchanged the estimated maximum amount of the obligations. Nothing at all was said as to this. The estimated cost of the project was certainly increased, but the cost to the Borough of Tenafly was not increased at all. It is with this expense that we must be concerned. The entire additional amount that the borough became obligated to pay was forthcoming, not from the municipal treasury, but rather from contributions and pledges of private citizens, handsomely supplemented by a further grant of $350,000 from the State Department of Environmental Protection.

█ The remaining issue, whether the amended disposition of the East Hill tract was an impermissible alteration of the purposes stated in Ordinance No. 1088, presents a novel question of interpretation of the Local Bond Law. First, we note that *N. J. S. A.* 40A:2–12 requires a statement of purpose "in brief and general terms sufficient for reasonable identification * * *." The statement of purpose in Ordinance No. 1088, see note 1, *supra,* contains a great deal of detail which goes well beyond the essential requirements of the statute. We think that the ordinance does, however, manifest clearly a basic purpose to acquire for "public recreation and park purposes * * * an area com-

monly known as the East Hill * * *." The settlement embodied in the April 22, 1976 resolution does not constitute a substantial deviation from this basic purpose.

Under the resolution, Tenafly would purchase 239.5 acres immediately from Centex, and 11 more acres from the Nature Conservancy. We consider the arrangement with Nature Conservancy to have been practically tantamount to an outright purchase by the municipality. Thus, the borough would ultimately acquire title to 85% of the tract. Plaintiffs assert that the mere diminution in acreage acquired by the municipality constituted a substantial alteration in the purposes set forth in Ordinance No. 1088. This argument fails to recognize the need for sufficient flexibility in the fiscal mechanism to permit adaptation to conditions and circumstances discovered during the execution of a project. It would seriously hamper the effectuation of substantial public improvements were it necessary to set forth in specific detail every element of such a proposal and then require an amending ordinance each time a change became necessary or desirable. As the trial court said:

It is rare that a municipality knows exactly what it has to spend to purchase a certain item or even to construct a project, particularly in light of the common occurrence of extras; most contracts are subject to the bidding law and the value of condemned land is commonly seen under our cases not to be usually fixed until all avenues of appeal have been exhausted or there has been a settlement. * * * * [T]he purpose of requiring prior authorization by ordinance is to insure accountability and prevent large municipal deficits. It is not intended where there were good faith proceedings to demand rigid adherence to initial calculations which are no more. than preliminary estimates, nor can the governing officials be second-guessed at every stage of litigation in the determination of what proceedings should or should not be taken or what settlements or arrangements should be entered where there is no facial invalidity and no allegation of bad faith.

Therefore, the acquisition of 85% rather than 100% of the

tract should be judged in light of the basic purpose of the project and the future use of the remaining 15%.[5]

Here, the municipality has not simply abandoned the remaining acreage to development. Instead, the acquisition of 14.5 acres by the Palisades Interstate Park Commission freed the borough from the necessity of paying the purchase price for this parcel, while at the same time assuring that the land would remain open space indefinitely. The future use of this acreage is clearly compatible with the "public park and recreation purposes" expressed in Ordinance No. 1088. Thus, the dispute centers around the 29 acres acquired by the Jewish Community Center. This land has been zoned for open space; under this zoning, only 3 acres are available for development. The Community Center plans to construct a cultural and recreational center, and to leave the remaining 26 acres open and undeveloped. Viewed realistically, permitting development of 3 acres of the tract for related recreational purposes in order to preserve the remaining 291 acres from development does not constitute a substantial al-

---

[5]Plaintiffs rely heavily upon *O'Farrell v. Sonoma Cty.*, 189 *Cal.* 343, 208 *P.* 117 (1922). We think that case is readily distinguishable. In *O'Farrell,* the county attempted to spend almost the entire proceeds of a highway bond issue to construct less than one-half of the authorized mileage, thereby doubling the cost to the county of the entire project. Tenafly, in contrast, has acquired 85% of the original acreage and has assured compatible use of virtually the entire tract. Further, subsequent California cases have not found *O'Farrell* to bar reasonable alterations in the execution of bond-financed projects. See, *e. g., Metropolitan Water Dist. v. Marquardt*, 59 *Cal.* 2d 159, 28 *Cal. Rptr.* 724, 379 *P.* 2d 28 (Sup. Ct. 1963) ("when bonds are proposed in accordance with a program based on estimated costs, the improvements may be carried out to the extent of the funds available") ; *Sacramento-Yolo Port Dist. v. Rodda*, 90 *Cal. App.* 2d 837, 204 *P.* 2d 372 (Dist. Ct. App. 1949) (cooperation with other government agency in execution of project) ; *City of San Diego v. Millan*, 127 *Cal. App.* 521, 16 *P.* 2d 357 (Dist. Ct. App. 1932) (substitution of dam types).

teration of the original purposes.[6] Rather, adoption of the settlement played a vital part in substantial achievement of the original purposes. Therefore, the resolution of April 22, 1976 was adequate to adopt the revised scheme.

We do not mean to suggest criticism of a local enactment like Ordinance No. 1088 simply because it is more informative than the law requires. The residents and taxpayers can only benefit from a detailed and comprehensive statement of what the governing body contemplates. At the same time, were we to hold that items of information or other statements set forth in the ordinance that go beyond those required by the act can be modified only by an amending ordinance, we would clearly defeat the legislative scheme of the Local Bond Law. It may of course be argued that if some ordinance provisions can be altered by resolution, the public may be misled. We think that here the test must be that of good faith. Publicity given to the enactment of an amending resolution —though not legally required—would go far to support an allegation of such good faith on the part of a municipality.

This brings us to the second argument made by the plaintiffs.[7] It is their contention that the acquisition of this tract in the manner described above will effectively remove the last substantial unimproved residentially-zoned tract of land in the borough from the reach of future development. This, it is contended, is contrary to our decision in *Mount Laurel, supra,* which obliges developing municipalities to exercise their zoning and planning powers to include their fair share of low and moderate income housing.

[6]Plaintiffs have also urged as a necessarily fatal flaw the disposition of these 29 acres under open space zoning rather than under Green Acres restrictions. We reiterate the importance of judging the extent to which the entire scheme, rather than individual components, comports with the basic purpose of the project. Further, we note that the Department of Environmental Protection *increased* Tenafly's Green Acres grant in order to permit the settlement to be consummated.

[7]*Amici curiae* joined in this argument.

The borough has acted in good faith in acquiring this property for a vitally important public purpose. It is pertinent to note that the New Jersey Green Acres Land Acquisition Act of 1971, *N. J. S. A.* 13:8A–19 *et seq.*, sets forth the following legislative findings:

a. The provision of lands for public recreation and conservation of natural resources promotes the public health, prosperity and general welfare and is a proper responsibility of government;

b. Lands now provided for such purposes will not be adequate to meet the needs of an expanding population in years to come;

c. The expansion of population, while increasing the need for such lands, will continually diminish the supply and tend to increase the cost of public acquisition of lands available and appropriate for such purposes;

d. The State of New Jersey must act now to acquire and to assist local governments to acquire substantial quantities of such lands as are now available and appropriate so that they may be preserved and developed for such purposes;

e. Since the most critical need for open lands now exists in the urban sectors of the State, special attention should be focused on the provision of lands for such purposes * * *.

[*N. J. S. A.* 13:8A–20]

Similar findings appear in the New Jersey Green Acres Land Acquisition and Recreation Opportunities Act, *N. J. S. A.* 13:8A–35 *et seq.* See especially *N. J. S. A.* 13:8A–36. We are also very mindful of the large and generous grants that were made by the State Department of Environmental Protection to ensure the accomplishment of this project. What Tenafly has done is not only in the public interest, but has also received the strongest kind of support from both the legislative and executive branches of government.

For the foregoing reasons, the judgment of the Superior Court, Law Division, is affirmed.

CONFORD, P. J. A. D., Temporarily Assigned, dissenting

I respectfully take issue with the Court's conclusion that the changes in the transaction at bar effected by the municipal resolution of April 22, 1976 did not constitute an amendment of the bond ordinance "substantially altering matters re-

quired by [the bond law] to be contained in the bond ordinance." See *N. J. S. A.* 40A:2–17. *Cf.* 40A:2–16, permitting all matters not required to be contained in the bond ordinance to be determined by resolution of the governing body.

There is no dispute that the bond law requires a bond ordinance to contain, *inter alia,* a statement "in brief and general terms sufficient for reasonable identification [of] the purpose or purposes for which the obligations are to be issued, a statement of the estimated maximum amount of bonds or notes to be issued and the estimated cost of any such purpose or purposes, * * *." The instant bond ordinance discharged the obligation of stating the purpose of the ordinance as follows:

the acquisition, by purchase or condemnation, of lands for passive open space public recreation and park purposes consisting of approximately 294 acres of an area commonly known as the East Hill of the Borough of Tenafly and further consisting of the following tracts or parcels: (1) Lots 3B and 5A in Block 229 and Lots 1, 2, 3 and 8 in Block 236 formerly owned by Norman E. Blankman, now owned by Centex Homes Corporation; (2) Lot 29 in Block 227 formerly owned by Ellen Ann Dunham; and (3) Lot 30 in Block 227 formerly owned by the New Early Christian Church; all the same being in accordance with the application for said contribution from the State of New Jersey under said Green Acres Local Matching Assistance Program.

The estimated maximum amount of bonds or notes to be issued was stated as $7,000,000, and the estimated cost of the project was set forth as $7,576,000.

The changes in these required specifications made by the resolution of April 22, 1976 did not affect estimated maximum amount of bonds and notes to be issued, but did alter the statements of the purpose and of the estimated cost.

As to change in statement of purpose, the bond ordinance specified as the purpose the acquisition of approximately 294 acres of the East Hill of Tenafly, whereas the resolution reduced the area to be purchased to 239 acres. I cannot understand how such a difference is not to be deemed a "sub-

stantial" alteration of the declared purpose, particularly since the outlay by the municipality for the reduced amount of land to be acquired was not also reduced under the changed transaction terms. The Court attempts to minimize the reduction in the quantity of land to be acquired by including the purchase by Nature Conservancy of 11 acres as "practically tantamount to an outright purchase by the municipality." But this ignores the fact that the resolution called only for a lease of the land to the town, with an ultimate conveyance to the town contingent upon redemption of pledges by private citizens in the amount of $355,000. If payment of the whole sum is not forthcoming, the conveyance need not be made. But even if the eleven acres is counted as part of the revised acquisition, the resulting total of 250 acres is still 15% less than that originally advertised to the public by the published ordinance as intended to be acquired. When it is considered that the net cost to the municipality for less land was not reduced, but, in fact, was increased by virtue of the tax abatement granted Nature Conservancy for the period of the lease, it becomes distinctly clear that a substantial alteration of a required item of the bond ordinance has been effected, within the public policy underlying the statutory requirement of republication and further public hearing in the event of such alteration.

The approach to satisfaction by municipalities of statutory fiscal requirements manifested by the Court in this case is at odds with the philosophy heretofore expressed by our courts with respect to analogous statutes regulating municipal expenditures and contractual undertakings. Illustrative is *Murphy v. West New York,* 132 *N. J. L.* 595, 597–598 (Sup. Ct. 1945).[1]

---

[1]Involving the predecessors of *N. J. S. A.* 40A:4–57 and 40:50–6. The former mandates budget appropriations for incurrences of liabilities or expenditures. The second forbids contracts for which there is no appropriation.

These are peremptory legislative mandates designed to incorporate sound business principles and practices into the fabric of the local economy, with particular reference to the avoidance of waste, extravagance and ill-considered spending, and thus to safeguard the interests of those laden with the tax burden and otherwise to serve the common good ; and it is axiomatic that they cannot be evaded by any pretense or device whatsoever. *Vide Frank Grad & Son, Inc. v. Newark,* 118 *N. J. L.* 376. Though not an insurance against local maladministration, *action by ordinance is a reflective process that also affords an opportunity for the expression of public opinion;* and this is manifestly the rationale of the statutory provisions under consideration.

(emphasis added).

See also *405 Monroe Co. v. Asbury Park,* 40 *N. J.* 457, 471–472 (1963) ; *Middlesex Concrete Corp. v. Carleret,* 28 *N. J.* 208, 213 (1958).

Another required provision of the bond ordinance which was substantially altered by the impugned resolution was that as to the estimated cost of the undertaking. As originally stated, this was $7,576,000. Under the resolution it was $8,147,000 ($7,495,000 payment to Centex, $427,000 for the Dunham and Church parcels and $225,000 for legal and other expenses). The Court cannot gainsay that the amended cost substantially exceeded the original estimated cost, and that the statutory requirement for an amendatory ordinance was therefore literally applicable, but it undertakes to palliate the violation by observing that the "cost to the Borough of Tenafly" was not increased but that the increase was to be met from contributions, pledges by private citizens and the $350,000 grant from the State Department of Environmental Protection.[2] But this circumstance is irrelevant. The statute mentions "estimated cost" of the improvement. not estimated net cost to the municipality. The Legislature is presumably aware of the fact that contributions by the state

---

[2] I have noted above that actual cost to Tenafly was increased by at least the tax abatement on the Nature Conservancy property. There was also a substantial abatement of taxes on the Centex holdings under the final arrangements.

and federal governments, and sometimes by others, are frequently made to assist municipal bonded projects, and if the intent of the bond statute was to require a statement of only estimated net cost to the municipality, it would presumably so have specified.

In my view, the policy underlying *N. J. S. A.* 40A:2–1 *et seq.* suggests that when a municipality undertakes issuance of bonds for an acquisition or capital improvement, the bond ordinance should contain information describing the entire transaction and the total cost thereof, so that the taxpayers may have an opportunity to assess the economic wisdom of the project for which they are asked to incur indebtedness. In this regard it may be noted that *N. J. S. A.* 40A:2–12 does not expressly limit the description of "purpose" or "cost" to that portion of the transaction which will be financed by bonds. Moreover, Section 12 clearly states that a bond ordinance must set forth, as two distinct items, the estimated maximum amount of bonds or notes to be issued, and the estimated cost of the purpose described in the ordinance.

Thus, for this additional reason, the bond act required republication and public hearing as to this additional substantial alteration of a required item of the bond ordinance.

Finally, as I appraise the complex multi-party arrangements purported to have been authorized by the April 22, 1976 resolution, an ordinance was preeminently required for the effectuation thereof, entirely independently of the strictures of the bond act — an ordinance, so that the public could be apprised and afforded an opportunity to be heard on the merits of the vastly altered transaction. It is to be kept in mind that Centex stipulated it would not sell the town any of its land unless all of it were taken. Thus, since the town now could not afford to take all, it had to enlist Nature Conservancy, Palisades Interstate Park Commission and the Jewish Community Center of Englewood to take and pay for the acreage which the town could not itself

pay for. Under the contractual arrangements agreed upon, no part of the "settlement" could be effected unless all of it was.

Of particular significance in this regard was the departure from the original intended use of the property in substantial particulars. The bond ordinance recited this project was being undertaken under Green Acres auspices, which limited the use of all the property, under Green Acres regulations, to "passive open space" and strictly confined the use of the land to environmental protection and conservation purposes. However, the arrangements concluded with the Palisades Interstate Park Commission and the Jewish Community Center of Englewood freed the lands taken by those parties from Green Acres regulations. Of the 29 acres taken by the latter organization, 3 acres are permitted to be used for construction of a large community center building, with a swimming pool, athletic facilities and a nursery school, while the other 26 acres are zoned "open zoning," which, while proscribing structures, allows many kinds of use forbidden by the Green Acres restrictions to passive open space.

Enough has been said to establish that these far-reaching changes in the purposes, arrangements and financing of the project as originally communicated to the public by the publication of the bond ordinance and the public hearing held thereon were required to be effected by an amendatory ordinance, rather than by resolution, so that the same opportunities of the taxpayers for apprisal of, and to be heard with respect to, the newly formulated arrangements and purposes of the project, could be afforded them.

It is obvious that the five-party interrelated contractual arrangements ultimately arrived at are so different from the relatively simple two-party deal contemplated by the bond ordinance, that there is plainly invocable the principle that an ordinance can be amended only by an ordinance, not by a resolution. *Am. Malleables Co. v. Bloomfield,* 83 *N. J. L.*

728, 734–735 (E. & A. 1912); *Albigese v. City of Jersey City,* 129 *N. J. Super.* 567, 569 (App. Div. 1974).

An additional incidental right of the citizenry of Tenafly was forfeited by the improper effectuation of the revised arrangements by resolution rather than ordinance. This was the right to petition for a referendum on any ordinance "authorizing the incurring of any indebtedness." *N. J. S. A.* 40:49–27. See *Retz v. Mayor and Council of Tp. of Saddle Brook,* 69 *N. J.* 563 (1976). There may well have been citizens of Tenafly satisfied with the terms of the project as originally fixed by the bond ordinance who would want a referendum on the revised terms and conditions authorized by the resolution.

The judgment of the Law Division should be reversed.

*For affirmance*—Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CARTON—6.

*For reversal*—Judge CONFORD—1.