824 A.2d 185 (2003)
361 N.J. Super. 1
Vivian DELAND and Anthony J. Scarpa, Plaintiffs, and
C.M.R. & Co., a New Jersey Partnership, Bedminster Associates and Monogram Building & Design Corp., Executors and Trustees for the Estate of Eugene Ladamocarski and the Connell Company, Plaintiffs-Intervenors,
v.
The TOWNSHIP OF BERKELEY Heights, a Municipal Corporation of the State of New Jersey, Defendant-Appellant, and
Donald E. Stitzenberg and Mary Ann Stitzenberg, Defendants-Intervenors, and
Salvigsen Development Co., Stanford Drive Builders, and K & K Developers, Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 2002.
Decided May 30, 2003.
*186 John C. Phillips argued the cause for appellant (Price, Meese, Shulman & D'Arminio, attorneys; Mr. Phillips and Maria Cristiano Anderson, on the brief).
Dean A. Gaver, Woodbridge, argued the cause for respondents Salvigsen Development Company and Stanford Drive Builders, LLC (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, attorneys; Mr. Gaver, of counsel; Mr. Gaver and Steven Firkser, on the brief).
Stewart M. Hutt, Woodbridge, argued the cause for respondent K & K Developers, Inc. (Hutt & Shimanowitz, attorneys; Mr. Hutt, of counsel; Mr. Hutt and Ronald L. Shimanowitz, on the brief).
Before Judges SKILLMAN, CUFF and LEFELT.
The opinion of the court was delivered by SKILLMAN, P.J.A.D.
In this Mount Laurel[1] appeal, we conclude that a Mount Laurel special master is subject to substantially the same conflict *187 of interest rules as a judge. We also conclude that a municipality which has rezoned property for affordable housing pursuant to a developer's agreement may subsequently acquire the property by eminent domain if the municipality has satisfied its affordable housing obligations and the property's fair market value is determined in accordance with the zoning established pursuant to the developer's agreement.

I
In 1987, the owners of property in Berkeley Heights brought this Mount Laurel action alleging that Berkeley Heights' zoning ordinance was unconstitutional because it did not provide a reasonable opportunity for construction of the municipality's fair share of affordable housing. In 1989, Berkeley Heights entered into an agreement settling this litigation, which incorporated a plan for compliance with its Mount Laurel obligations that included rezoning of several tracts of land for affordable housing. Respondents Salvigsen Development Co. and Stanford Drive Builders, L.L.C. (Salvigsen) are the successors in interest of the owners of two of those tracts, referred to in this litigation as the "Park Edge" and "Stanford Drive" sites.[2]
When Berkeley Heights settled this litigation, it entered into developer's agreements with the owners of the properties rezoned for affordable housing. The agreement with Salvigsen's predecessors in title provided for construction of 100 senior citizen residential units on the Park Edge site, 64 of which were required to be affordable to lower income households, and construction of a maximum of 259 units on the Stanford Drive site, all of which originally were to be market rate units. A subsequent amendment to the agreement shifted thirty-two of the affordable housing units from the Park Edge site to the Stanford Drive site. According to Salvigsen's president, the Stanford Drive and Park Edge sites were considered to be a single development project for purposes of Berkeley Heights' compliance plan.
On December 12, 1989, the trial court entered a final judgment of compliance that incorporated the settlement and developer's agreements. The judgment fixed Berkeley Heights' "first round" affordable housing obligations at 261 units and conferred a six-year period of repose from Mount Laurel litigation. On December 14, 1995, the court entered another order that fixed Berkeley Heights' "second round" affordable housing obligation at 190 units, granted the municipality credits for affordable housing units constructed during the intervening six years, and extended its period of repose from Mount Laurel litigation for another six years until December 12, 2001.[3]
In early 1997, Salvigsen completed construction on the Park Edge site, which consisted of thirty-two affordable senior citizen housing units and sixty-eight market rate units. Later that year, Salvigsen entered into a contract to sell the Stanford Drive site to K & K, contingent upon receipt of all governmental approvals required for development. An appraisal *188 report attached to the contract of sale indicated that remediation of asbestos contamination on the site could cost upwards of $1.7 million. This report also stated that the wetlands permit for the site had expired and that a new letter of interpretation had identified a greater area of wetlands than had been previously indicated.
In September 1999, David Kinsey, the special master the court had appointed to supervise Berkeley Heights' compliance with its Mount Laurel obligations, reported that the municipality had satisfied its obligations under both the 1989 consent judgment and the 1995 order extending Berkeley Heights' period of repose until December 12, 2001.
Shortly thereafter, Berkeley Heights filed a motion to delete the Stanford Drive site from its Mount Laurel compliance plan. Berkeley Heights submitted an affidavit in support of the motion which stated that the site had more extensive wetlands and asbestos contamination than had been previously revealed. This affidavit also indicated that Berkeley Heights had adopted an ordinance, which would become effective upon the court's approval, to rezone the site to "Open Land."
The trial court denied Berkeley Heights' motion to delete the Stanford Drive site from its compliance plan. In a written opinion, the court stated that it would not "allow the Mount Laurel doctrine to be weakened by a Township's amendment to the Compliance Plan and change of zoning where a developer has dealt in good faith to comply with the Compliance Plan to provide Mount Laurel housing."
After the trial court denied Berkeley Heights' motion to delete the Stanford Drive site from its compliance plan, Berkeley Heights filed an action to acquire the site by eminent domain for recreational and open space uses. Berkeley Heights subsequently adopted an ordinance which also authorized the construction of up to thirty-two units of affordable housing on the site to satisfy part or all of its obligations under the "third round" rules of the Council on Affordable Housing (COAH) expected to be adopted shortly.
In addition, Berkeley Heights filed a motion in this action to transfer jurisdiction to COAH. Salvigsen responded by filing a new motion, in which K & K joined,[4] to enjoin Berkeley Heights from interfering with development of the Stanford Drive site, including acquisition of the site by eminent domain. Before the return date, Berkeley Heights filed a motion for removal of David Kinsey as special master on the ground that he had a disqualifying conflict of interest, which only recently had come to the municipality's attention, and for reconsideration of the denial of its motion to delete the Stanford Drive site from its compliance plan or, in the alternative, to transfer jurisdiction to COAH.
By oral opinion, the trial court denied Berkeley Heights' motions and granted Salvigsen's motion to enjoin Berkeley Heights from interfering with development of the Stanford Drive site including its acquisition by eminent domain. The court's essential rationale was that Berkeley Heights' planned acquisition of the site was simply an alternative method, devised in response to the court's denial of its motion for deletion of the site from its compliance plan, for Berkeley Heights to avoid its obligations under the developer's agreement with Salvigsen's predecessors *189 in title. Accordingly, the court entered an order on July 6, 2001, (1) denying Berkeley Heights' motion for Kinsey's removal as Special Master; (2) denying Berkeley Heights' motion to transfer jurisdiction to COAH; and (3) granting Salvigsen's motion to enjoin Berkeley Heights' from interfering with K & K and Salvigsen's efforts to develop the Stanford Drive site, including its planned acquisition by eminent domain.
The eminent domain action filed by Berkeley Heights was subsequently dismissed on the basis of the injunction issued in this case.
Berkeley Heights filed separate appeals from the July 6, 2001 order in this case and the order dismissing its action to acquire the Stanford Drive site by eminent domain.[5]
On appeal, Berkeley Heights argues that the trial court erred in denying its motions to disqualify the special master, permit deletion of the Stanford Drive site from its compliance plan and transfer jurisdiction to COAH. Berkeley Heights also argues that the court erred in enjoining its action to acquire the Stanford Drive site by eminent domain.
We conclude that the special master should have been disqualified from providing recommendations regarding the Stanford Drive site but that there is no need for remand to the trial court for reconsideration of its rulings. We also conclude that the court properly denied Berkeley Heights' motions to delete the Stanford Drive site from its compliance plan and transfer jurisdiction to COAH. However, the court should not have enjoined Berkeley Heights from pursuing an action to acquire the Stanford Drive site by eminent domain.

II
In Mount Laurel II, the Court authorized trial judges assigned to hear Mount Laurel cases to appoint special masters. 92 N.J. at 281-85, 456 A.2d 390. The Court indicated that such a special master is only authorized to make recommendations and may not be delegated decision-making authority:
The master's powers are limited to rendering opinions, proposing findings, issuing recommendations, and assisting the court in other similar ways as it may direct. It is the trial court that must ultimately determine, independently, whether or not the municipality has conformed to its judgment and to the Mount Laurel doctrine.
[Id. at 284-85, 456 A.2d 390.]
Pursuant to this authorization, early in this litigation the trial court appointed David Kinsey as special master to "oversee [Berkeley Heights'] compliance" with its Mount Laurel obligations. The court continued this appointment in the December 12, 1989 judgment of compliance and the December 14, 1995 order extending Berkeley Heights' period of repose from Mount Laurel litigation to December 12, 2001.
When Berkeley Heights moved to delete the Stanford Drive site from its compliance plan, Kinsey submitted a detailed report which concluded that even though Berkeley Heights had fully satisfied its second round fair share obligations, the motion should be denied. The trial court's opinion denying Berkeley Heights' motion relied to some extent upon Kinsey's analysis and recommendations.
*190 Six months later, Berkeley Heights filed a motion for Kinsey's removal as special master. This motion also sought reconsideration of the denial of Berkeley Heights' motion to delete the Stanford Drive site from its compliance plan. Berkeley Heights' motion was based on an alleged conflict of interest arising out of Kinsey's work for two corporations in which Zygmunt Wilf, who had a financial interest in K & K, the contract purchaser of the Stanford Drive site, held a financial interest.
In a detailed letter to the court, Kinsey described his relationship to Wilf and his reasons for concluding that this relationship did not require his removal as special master:
[D]uring April 1994 to January 1997, I was the planning expert for Wellfleet Developers, Inc., the builder-plaintiff in the Mount Laurel litigation in Roxbury. In January 1997, the trial court approved a settlement agreement between the Township of Roxbury and my client that provided for the inclusionary rezoning of a package of three linked sites.
During approximately the same period, from September 1994 to September 1997, I was the planning expert for Livingston Builders, Inc., a builder-plaintiff in the Mount Laurel litigation in Livingston. In September 1997, the trial court approved a settlement agreement between the Township of Livingston and my client that provided for the inclusionary rezoning of my client's site.
In both the Roxbury and Livingston matters, I was contacted by and retained by Mark Fisch, Esq., a principal of both Wellfleet Developers, Inc. and Livingston Builders, Inc. My day-to-day contact was Jim Cahill, the Vice President for Land Planing at Continental Properties, a trademark and trade name for real estate developed by Fisch. At some point in 1994-1996, someone, probably Jim Cahill, told me that the Wilf family had interests in both entities. At no time had I met or had any contact with anyone named Wilf. To this day, I do not know the extent of Wilf interests in these two entities, other than that the Wilfs have some interests, probably as investors.
....
On March 22, 1996, I met with Springfield Township representatives ... and a developer, Mr. Frank Raccioppi, at their invitation, to discuss relief requested by the developer from the Court-imposed scarce resource restraint on land.[6] Joining the developer at the meeting was a Mr. Zygmunt Wilf, who was introduced as Mr. Raccioppi's partner.... That meeting was the first and only time I ever met Mr. Wilf.
....
Once trial courts approved the Mount Laurel settlement agreements in Roxbury and Livingston, both in 1997, my work was done for those builder-plaintiff clients.
Then, in May 1999, my client in Roxbury, Wellfleet Developers, Inc., sought my advice and assistance in supporting the 1998 "cross-acceptance" proposal of the Township of Roxbury and Morris County to the State Planning Commission for a Planning Area amendment for areas of Roxbury, including some of my client's sites. The attorney for Wellfleet *191 Developers, Inc. on this new issue ... contacted me initially about this new assignment. During May 1999-May 2000, I carried out this assignment through planning analyses, letters, memos and presentations to the Plan Development Committee of the State Planning Commission on Planning Area designations in Roxbury.
....
I first learned about K & K Developers, Inc. on October 29, 1999, when its attorney, Ronald L. Shimanowitz, told me K & K was the contract purchaser of the Stanford Drive site. Shimanowitz told me about the woman who owned the site (Frida Salvigsen), the local counsel... that he was the Mount Laurel counsel, that the Wilfs were involved, and that the builder was named Sam Gershwin....
I met with representatives of K & K for the first and only time on February 2, 2000, when I met with Sam Gershwin, Vice President of K & K, and his attorney, Mr. Shimanowitz, in the context of my attempt, under Your Honor's February 2000 Order Providing for Mediation, to mediate the dispute triggered by the Township of Berkeley Heights' November 1999 Motion to Amend Compliance Plan.
In my letter-report of May 22, 2000, I recommended that Your Honor deny the Township's Motion, for failure to comply with four specific COAH rules. I never thought about the Wilfs, Wellfleet Developers, Inc., or my work before the State Planning Commission concerning sites in Roxbury, in analyzing the Township's Motion, the filings of the parties, and COAH rules, either in my letter-report or in my response to the Township's interrogatories.
I do not have a previous, continuing, or anticipated professional, financial, or business relationship with K & K. K & K is not and has never been my client.
I do not have a previous, continuing, or anticipated professional, financial, or business relationship with the Wilfs. The Wilfs are not and have never been my client.
....
I do not have a continuing or anticipated client relationship with either Wellfleet Developers, Inc. or Livingston Builders, Inc.
I firmly believe that any relationship I may have had with Wilf interests, who owned some undefined interest in two corporate entities, Wellfleet Developers, Inc. and Livingston Builders, Inc., is remote, indirect and insignificant. I do not perceive this relationship to be a conflict of interest. However, I also understand that Mount Laurel litigation and compliance is an important matter of public concern. Therefore, to avoid the appearance of a conflict of interest in this matter, I am willing to recuse myself from further involvement in these proceedings or resign as Special Master, as Your Honor might decide.
In its oral opinion denying Berkeley Heights' motion for Kinsey's removal as special master, the trial court stated:
[T]he alleged conflict of interest of which the Township complains is not sufficient to cause this court to disqualify Dr. Kinsey who has been extensively involved in the Berkeley Heights Mount Laurel litigation since 1988. He has carried out his obligations in the Berkeley Heights Mount Laurel matter and his intervention in this matter has led to the development of all Berkeley Heights Mount Laurel sites, save the [Stanford Drive] site.
Further, he was involved in facilitating agreements regarding this particular site long before any interest in the property *192 in question [was acquired] by K & K Builders. His connection to Mr. Wilf who Dr. Kinsey met only once, is tenuous at best and is not, as the Township contends, an ongoing substantial relationship in which Dr. Kinsey would seek to serve the interests of the contract purchaser of the [Stanford Drive] property at the expense of fairly and impassionately looking at the merits of this case in which he has served as special master for in excess of 13 years.
Furthermore, this court, not Dr. Kinsey, made a final ruling in this case and this court stands by its ruling[.]
We recognize that the role of a Mount Laurel special master is purely advisory, and that the court retains ultimate decision-making authority. Mount Laurel II, supra, 92 N.J. at 284-85, 456 A.2d 390. In addition, we recognize that most Mount Laurel special masters are planners who serve in this role on a part-time basis and also provide advice to developers and municipalities involved in other Mount Laurel litigation. Consequently, the current system of appointment of Mount Laurel masters creates the inherent potential for the kind of conflict that arose when K & K became the contract purchaser of the Stanford Drive site. Moreover, we recognize that the appointment of a new special master to replace a master who has developed a familiarity with a municipality's compliance plan may result in additional costs to the parties and delay implementation of the plan.
Nevertheless, we conclude that strict conflict of interest rules should apply to Mount Laurel special masters. Although the role of such a master is advisory only, the master's recommendations may be highly influential in some circumstances. Moreover, Mount Laurel cases are matters of great public sensitivity. Consequently, the courts must strive to preserve an appearance of complete impartiality in the decision-making process.
Rule 1:12-1(f) provides that "[t]he judge of any court shall be disqualified ... when there is any ... reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." We conclude that in view of the sensitivity of Mount Laurel cases, the special masters who provide recommendations to judges in those cases must be subject to substantially the same conflict of interest rules as judges, including Rule 1:12-1(f).
The disclosure that a master who submitted recommendations to a judge in a Mount Laurel case also was acting as the planner for developer-plaintiffs in other Mount Laurel cases, and that the same person held financial interests both in those developers and in a developer who stands to benefit from the planner's recommendations as a special master, could cause the parties and the public to question the impartiality of the judicial decision-making process. Therefore, once Kinsey became aware of Wilf's financial interest in K & K, he should have refrained from providing any recommendation to the court regarding the deletion of the Stanford Drive site from Berkeley Heights' compliance plan.
However, this does not mean that the trial court's denial of Berkeley Heights' motion to delete the Stanford Drive site from its plan or any of the court's subsequent rulings must be remanded for reconsideration based on the recommendation of a new special master. Those rulings were primarily legal in nature, and this court can fairly review them without a remand. Moreover, Kinsey's failure to refrain from providing recommendations regarding the deletion of the Stanford Drive site from Berkeley Heights' plan would not preclude *193 the court from utilizing his services concerning any issue that would not affect K & K.

III
Next we consider Berkeley Heights' argument that the trial court erred in denying its motion to delete the Stanford Drive site from its compliance plan. In support of this argument, Berkeley Heights relies primarily upon a recent amendment to the Fair Housing Act (FHA), N.J.S.A. 52:27D-307 to -329, which provides that a municipality which has received substantive certification from COAH and actually satisfied its affordable housing obligations may amend its compliance plan and zoning ordinances without COAH's approval, N.J.S.A. 52:27D-311(g).
Initially, we note that N.J.S.A. 52:27D-311(g) became effective on January 11, 2002, L. 2001, c. 441, § 1, subsequent to the denial of Berkeley Heights' motions for deletion of the Stanford Drive site from its compliance plan and for reconsideration of that motion. Nevertheless, because Berkeley Heights could renew its motion to delete the Stanford Drive site based on this new legislation and the trial court concluded that Berkeley Heights' action to acquire the property by eminent domain was simply a device to circumvent denial of that motion, some discussion of Berkeley Heights' argument is appropriate.
N.J.S.A. 52:27D-311(g) provides:
A municipality which has received substantive certification from [COAH], and which has actually effected the construction of the affordable housing units it is obligated to provide, may amend its affordable housing element or zoning ordinances without the approval of [COAH].
Thus far, COAH has not adopted any regulations interpreting or implementing this new section of the FHA.
It is clear on its face that N.J.S.A. 52:27D-311(g) does not apply to a Mount Laurel compliance plan which has been approved by a court rather than by COAH because a municipality may avail itself of the right to amend its affordable housing element or zoning ordinances without COAH's approval only if it "has received substantive certification from [COAH]." Nevertheless, Berkeley Heights argues that N.J.S.A. 52:27D-311(g) should be construed also to apply to a municipality which has obtained a judgment of repose from a court because the Supreme Court has indicated that a trial court hearing a Mount Laurel case "should conform wherever possible to the decisions, criteria and guidelines of [COAH]." Hills Dev. Co. v. Township of Bernards, 103 N.J. 1, 63, 510 A.2d 621 (1986).
We perceive no reason to extend the plain language of N.J.S.A. 52:27D-311(g) in this manner. If the Legislature had intended to allow not only municipalities which have obtained substantive certification from COAH but also municipalities which have obtained a judgment of compliance from a court to change their housing element and zoning ordinance without approval, it easily could have said so. Consequently, the omission from N.J.S.A. 52:27D-311(g) of any mention of the Superior Court cannot be viewed as simply a matter of legislative inadvertence.
Furthermore, the FHA does not treat COAH's review of municipal compliance plans and Mount Laurel litigation in the Superior Court the same way. Instead, the FHA reflects a "preference for the resolution of existing and future disputes involving exclusionary zoning" through COAH's administrative processes. Fair Share Hous. Ctr., Inc. v. Township of *194 Cherry Hill, 173 N.J. 393, 395, 802 A.2d 512 (2002) (quoting N.J.S.A. 52:27D-303). It is consistent with this legislative preference to treat municipalities differently, depending upon whether they voluntarily submitted their Mount Laurel compliance plans for review by COAH or were involuntarily subjected to court supervision through a successful builder's remedy lawsuit.
Most importantly, Salvigsen's right to develop the Stanford Drive site in accordance with its current zoning is not based solely upon the judgment of repose but also upon the developer's agreement Berkeley Heights entered into with Salvigsen's predecessors in title. We have previously held that a developer's agreement to implement a Mount Laurel compliance plan, under which a municipality agrees to rezone a developer's property for high density residential development with a percentage of units set aside for affordable housing, is valid and enforceable, so long as the municipality complies with the applicable statutory procedures for amendment of its master plan and zoning ordinance:
Courts have the power to approve a settlement in an exclusionary case, provided certain procedures are followed to ensure that the interests of low and moderate income households are adequately protected.... Contract zoning is illegal when, pursuant to an agreement, the municipality rezones property without complying with prescribed procedures for amending the master plan and zoning ordinance. Properly supervised Mount Laurel settlements resulting in a consent judgment do not involve illegal contract zoning.
[Toll Bros., Inc. v. Township of W. Windsor, 334 N.J.Super. 77, 94, 756 A.2d 1056 (App.Div.2000), certif. denied, 168 N.J. 295, 773 A.2d 1159 (2001).]
This does not mean that a municipality which has rezoned property pursuant to a developer's agreement to implement a Mount Laurel compliance plan must retain that zoning in perpetuity. A municipality may obtain relief from a judgment approving a compliance plan, including a settlement agreement providing for rezoning of a developer's property for high-density residential development, if it can show that "it is no longer equitable that the judgment ... should have prospective application." Id. at 98, 336 A.2d 713 (quoting R. 4:50-1(e)). To make this showing, a municipality "must demonstrate significant change in facts or applicable law warranting revision of the consent judgment and orders, and that removal of the sites from the plan is `suitably tailored to the changed circumstance.'" Id. at 102, 336 A.2d 713 (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 393, 112 S.Ct. 748, 765, 116 L. Ed.2d 867, 892 (1992)).
A municipality's satisfaction of its affordable housing obligations since entering into a consent judgment settling a Mount Laurel action is a changed circumstance that may warrant relief from the judgment. Mount Olive Complex v. Township of Mount Olive, 340 N.J.Super. 511, 529, 774 A.2d 704 (App.Div.2001), remanded for reconsideration, 174 N.J. 359, 807 A.2d 192 (2002), decision reaffirmed, 356 N.J.Super. 500, 813 A.2d 581 (App. Div.), certif. denied, 176 N.J. 73, 819 A.2d 1189 (2003). However, as with any other motion under Rule 4:50-1(e), the mere showing of a changed circumstance is not, by itself, a sufficient basis for relief from the judgment; the moving party also must show that as a result of that changed circumstance, "it is no longer equitable that the judgment or order should have prospective application[.]" R. 4:50-1(e). Therefore, the fact that the continuation of *195 zoning for high-density residential development could result in municipality "zoning for more than its fair share [of affordable housing] is not in itself grounds for terminating a prior consent judgment." Toll Bros., supra, 334 N.J.Super. at 108, 756 A.2d 1056.
It is undisputed that the Stanford Drive and Park Edge sites have always been considered a single development project for purposes of Berkeley Heights' Mount Laurel compliance plan. Under the original developer's agreement, all sixty-four of the affordable housing units that Salvigsen's predecessor in title had agreed to provide were to be constructed on the Park Edge site. By a later amendment, Berkeley Heights agreed that thirty-two of those units could be constructed on the Stanford Drive site. However, even under this amendment, Salvigsen was required to make 32 of the 100 units on the Park Edge site affordable to lower income households, which was nearly double Salvigsen's overall obligation to make 18% of the total units in the Park Edge-Stanford Drive development project affordable to lower income households. Moreover, it is undisputed Salvigsen suffered a loss on the construction of the Park Edge site, due to the high percentage of affordable units, which it anticipated recouping by developing the Stanford Drive site with 259 condominium units, only 32 (12.4%) of which would be required to be affordable to lower income households. Therefore, we agree with the trial court that it would have been "inequitable" to deprive Salvigsen of the opportunity to "recoup its losses from the 32 Mount Laurel units already completed on the Park Edge site" by allowing Berkeley Heights to delete the Stanford Drive site from its compliance plan and rezone that site for Open Land or other less intense uses.

IV
Berkeley Heights' argument that the trial court erred in denying its motion to transfer the case to COAH requires only brief discussion.
The FHA provides that "unless [a] municipality... files its fair share plan and housing element with [COAH] prior to the institution of litigation[,]" a party who institutes a Mount Laurel action has no obligation to exhaust the "administrative remedy requirements [of N.J.S.A. 52:27D-316]." N.J.S.A. 52:27D-309(b). Thus, the FHA gives a municipality "the option to adopt a fair-share plan that conforms to COAH regulations or take its chances in court[.]" Toll Bros., supra, 334 N.J.Super. at 92, 756 A.2d 1056. If a municipality does not invoke COAH's administrative processes before a developer files Mount Laurel litigation, "COAH will accept jurisdiction only on transfer by the court[,]" ibid.; see N.J.A.C. 5:91-2.1(a)(4). A trial court has broad discretion in determining whether such a transfer will promote the policies of the FHA. See Toll Bros., supra, 334 N.J.Super. at 92-93, 756 A.2d 1056.
Although this action was initiated in 1987, Berkeley Heights never attempted anytime during the next thirteen years to transfer to COAH. The 1989 judgment of compliance and the 1995 order extending Berkeley Heights' period of repose both provided for the court's retention of jurisdiction. Moreover, Berkeley Heights did not seek transfer to COAH when it moved in late 1999 to delete the Stanford Drive site from its compliance plan. It was only after the court denied this motion that Berkeley Heights moved to transfer to COAH.
In denying Berkeley Heights' motion, the trial court stated:
[Berkeley Heights] ... is simply reiterating arguments that it made ... previously in its attempt to have the
*196 [Stanford Drive] site deleted from its compliance plan. It is obvious ... that the reason [Berkeley Heights] seeks to transfer jurisdiction over this matter to COAH is to get a second bite at the apple in an attempt to have this site removed from its compliance plan.
We affirm the denial of Berkeley Heights' motion to transfer the case to COAH substantially for the reasons stated by the trial court.

V
Finally, we consider the part of the July 6, 2001 order that enjoined Berkeley Heights from acquiring the Stanford Drive site by eminent domain for public recreation and other municipal uses.
Initially, we note the limited issue presented by Berkeley Heights' proposed acquisition of the Stanford Drive site. Berkeley Heights has complied with its Mount Laurel obligations under the 1995 order extending the period of repose from Mount Laurel litigation. Furthermore, Berkeley Heights has adopted an ordinance providing for construction of up to thirty-two affordable housing units on the Stanford Drive site to satisfy any additional affordable housing obligations that it may have under COAH's "third round" rules. Under this ordinance, Berkeley Heights would be able to construct the same number of affordable housing units on the site as Salvigsen is obligated to provide under the amended developer's agreement. Consequently, we are not confronted with a municipality that is seeking to undermine its capacity to satisfy its Mount Laurel obligations by acquiring land suitable for high-density residential development for another purpose. Cf. Dolan v. Borough of Tenafly, 75 N.J. 163, 174-75, 380 A.2d 1119 (1977). Salvigsen's sole argument is that Berkeley Heights' acquisition of the Stanford Drive site by eminent domain would violate the developer's agreement Berkeley Heights entered into with Salvigsen's predecessors in title.
The Legislature has delegated broad authority to municipalities to acquire private property by eminent domain for public uses including recreation and open space. See, e.g., N.J.S.A. 40A:12-3 to 5. Therefore, "a reviewing court will not upset a municipality's decision to use its eminent domain power `in the absence of an affirmative showing of fraud, bad faith or manifest abuse.'" Township of W. Orange v. 769 Assocs., L.L.C., 172 N.J. 564, 571, 800 A.2d 86 (2002) (quoting City of Trenton v. Lenzner, 16 N.J. 465, 473, 109 A.2d 409 (1954), cert. denied, 348 U.S. 972, 75 S.Ct. 534, 99 L.Ed. 757 (1955)).
Moreover, courts are reluctant to enjoin litigation prospectively. See D'Amore v. D'Amore, 186 N.J.Super. 525, 530, 453 A.2d 251 (App.Div.1982). Generally, there are only two categories of litigation that may be enjoined:
The first includes attempts to litigate claims despite their preclusion by such legal doctrines as res judicata. The second includes claims which are already pending or are about to be instituted in another forum whose jurisdiction thereover is superior or prior.

[Ibid.]
The trial court apparently conceived that Berkeley Heights' plan to acquire the Stanford Drive site by eminent domain would fall within the second category of enjoinable litigation because, in granting Salvigsen's motion to enjoin continuation of the action, it stated:
When [this] court [made] its ... decision denying [Berkeley Heights'] request to delete the Stanford Drive site from its compliance plan, one of the driving factors was that it would have been inequitable for [Berkeley Heights] *197 to be able to unilaterally deprive the owner and the contract purchaser of rights to develop the property when they had in good faith relied upon previous extensively negotiated agreements regarding the development of the property for affordable housing....
The action [Berkeley Heights] seeks to take now is to achieve the same results as the re-zoning would have achieved [by] different means....
However, the court failed to recognize that Berkeley Heights' condemnation of the Stanford Drive site, as currently zoned, would not have the same adverse economic impact upon Salvigsen as an order authorizing Berkeley Heights to delete the site from its Mount Laurel compliance plan and rezone it for another less intense use. The zoning of a property "bear[s] crucially" upon its fair market value. State, by State Highway Comm'r v. Gorga, 26 N.J. 113, 116, 138 A.2d 833 (1958). The current zoning of the Stanford Drive site for 259 residential units, of which only 12.4% are required to be affordable to lower income households, undoubtedly has resulted in the site having a significantly higher fair market value than if it were zoned for another less intense use. Consequently, if the trial court had allowed Berkeley Heights to delete the Stanford Drive site from its compliance plan and rezone it for Open Space, the site's fair market value would have been substantially reduced. This was the "inequitable" result the trial court referred to in denying Berkeley Heights' motion to delete the Stanford Drive site from its compliance plan.
Berkeley Heights' acquisition of the Stanford Drive site by eminent domain would not lead to this same inequitable result because Salvigsen would be awarded the fair market value of its property as currently zoned in that proceeding. Fair market value has been described as "the value that would be assigned to the acquired property by knowledgeable parties freely negotiating for its sale under normal market conditions based on all surrounding circumstances at the time of the taking." State, by Comm'r of Transp. v. Silver, 92 N.J. 507, 514, 457 A.2d 463 (1983). Those surrounding circumstances include the current zoning of the property as provided by the developer's agreement Berkeley Heights entered into with Salvigsen's predecessors in title. See Gorga, supra, 26 N.J. at 115-16, 138 A.2d 833. Therefore, Salvigsen should realize the same amount in the eminent domain action brought by Berkeley Heights as it would receive in a sale to a private party such as K & K.[7]
We also note that even if Berkeley Heights were barred from acquiring Salvigsen's property by eminent domain, the State or federal government could still condemn the property for any appropriate public use. In its action to acquire the Stanford Drive site, Berkeley Heights will be subject to the same rules for determination of fair market value as any other condemning authority.
At oral argument, Salvigsen and K & K expressed doubt whether they would realize *198 the full fair market value of the Stanford Drive site in an eminent domain action. However, when a municipality or other public agency acquires private property by eminent domain, the property owner is constitutionally entitled to receive "just compensation," which is defined as "the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act." Silver, supra, 92 N.J. at 513, 457 A.2d 463. We must assume that the valuation process in the action to acquire the Stanford Drive site by eminent domain will result in an award that complies with this constitutional mandate.
Salvigsen and K & K also contend that the condemnation of their property is motivated by bad faith. However, the claim that Berkeley Heights brought the eminent domain action in bad faith or for an improper motive, and thus the municipality's acquisition of the Stanford Drive site will not advance the public interest, can be raised in that action. See Township of W. Orange v. 769 Assocs., supra, 172 N.J. at 577, 800 A.2d 86.
Therefore, the trial court should not have enjoined Berkeley Heights' action to acquire the Stanford Drive site by eminent domain on the ground that the initiation of that action violated the court's prior order denying Berkeley Heights' motion to delete the site from its compliance plan.
Accordingly, we affirm the parts of the July 6, 2001 order that denied Berkeley Heights' motion for reconsideration of the denial of its motion to delete the Stanford Drive site from its compliance plan or transfer the case to COAH and that granted Salvigsen's motion to require Berkeley Heights to retain the site's current zoning. We reverse the part of the order that enjoined Berkeley Heights from maintaining its action to acquire the Stanford Drive site by eminent domain. The parts of the order denying Berkeley Heights' motion to remove Kinsey as special master are modified as indicated in section I of this opinion.
NOTES
[1] S. Burlington County N.A.A.C.P. v. Township of Mount Laurel, 67 N.J. 151, 336 A.2d 713, cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L. Ed.2d 28 (1975) ("Mount Laurel I"); S. Burlington County N.A.A.C.P. v. Township of Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983) ("Mount Laurel II").
[2] There is no indication in the record before us that Salvigsen, any of its predecessors in title or K & K Developers (K & K), the contract purchaser of the Stanford Drive site, were parties to the original action or ever formally intervened. Nevertheless, the trial court treated Salvigsen and K & K as if they were intervenors. We have added Salvigsen and K & K to the caption for the purposes of this opinion and have designated them as respondents.
[3] Berkeley Heights' "third round" affordable housing obligation has not yet been determined.
[4] Salvigsen and K & K are sometimes referred to collectively in this opinion as Salvigsen.
[5] Our opinion in the appeal from the dismissal of Berkeley Heights' action to acquire the site by eminent domain is being filed simultaneously with this opinion. Township of Berkeley Heights v. Salvigsen Dev. Co., A-362-01.
[6] Kinsey also served as special master in Mount Laurel litigation against Springfield Township. Subsequent to the March 22, 1996 meeting referred to in this sentence, Kinsey resigned from that assignment because of his relationship with Wilf. Kinsey pointed to differences between the conflict of interest questions in the Springfield case and this case in parts of his letter that are not quoted in this opinion.
[7] The record does not indicate what affect the eminent domain action would have upon the contract of sale between Salvigsen and K & K. In any event, the only issue in that action would be "the lump sum compensation to be paid by the condemnor for the property represented by its fair market value." State, by Comm'r of Conservation & Econ. Dev. v. New Jersey Zinc Co., 40 N.J. 560, 573, 193 A.2d 244 (1963). "Those having interests in the property less than ownership or claims arising by reason of the condemnation can only be compensated by appropriate division of the fund thereby created." Id. at 574, 193 A.2d 244; see also City of Atlantic City v. Cynwyd Inv., 148 N.J. 55, 71, 689 A.2d 712 (1997).